CRISTINA RIVERA NIEVES VDA. DE RUIZ, recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD, SECCIÓN DE PONCE, recurrido.

*Número:* G-65-19      *Resuelto:* 31 de enero de 1967

*Armando Irizarry Hernández,* abogado del recurrente; El Registrador compareció por escrito.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

El 17 de setiembre de 1964, Cecilio Ruiz Vega por sí y en representación de nueve hermanos suyos, entre ellos el menor emancipado Víctor Luis Ruiz Miranda, vendió por escritura pública, a Cristina Rivera Nieves, la mitad de cierta finca urbana situada en Ponce.

Con los documentos complementarios de rigor se presentó al Registro para su inscripción la escritura de venta. Fue inscrito el título,

" . . . con el defecto de no acreditarse que en el otorgamiento de la escritura de Emancipación se hubieron llenado los requisitos que en cuanto a su forma y solemnidades se exigen por las leyes del Estado de Nueva York según lo resuelto en el caso de *Rojas, Randall & Co.* v. *Registrador*, 27 D.P.R. 21."

Con razón, sostiene la compradora recurrente que su título no adolece de tal defecto y que era improcedente atribuírselo.

En la documentación presentada al Registro claramente constan las siguientes circunstancias:

(1) El menor emancipado Víctor Luis Ruiz Miranda, nació en Ponce, el 28 de septiembre de 1943, por lo que a la fecha en que se otorgó el documento de su emancipación—17 de febrero de 1962—tenía 18 años y 4 meses de edad; (2) su padre Ramón Ruiz Hernández había fallecido, ejerciendo entonces la patria potestad sobre él su señora madre Petra Miranda; (3) la emancipación se verificó por un documento otorgado en la ciudad de Nueva York, en la fecha indicada suscrito por la señora Miranda, el menor Víctor Luis—que la consintió—y los testigos Luz Mercedes O'Faurie y José O. Lugo. Aparece autenticado por el Notario Ramón Ortiz Díaz. El cargo de Notario que éste ejerce aparece acreditado por un certificado librado por James McGurrin, Secretario del Condado y de la Corte Suprema del Condado de Nueva York; (4) el documento de emancipación fue protocolizado en Ponce, el 23 de febrero de 1962, mediante escritura pública, conforme a lo dispuesto por la vigente Sec. 17 de la Ley Notarial. En lo principal de su texto dice así el documento de emancipación:

"EMANCIPACIÓN.—En la ciudad de Nueva York Estado del Mismo nombre, Estados Unidos de Norte América, a los 17 días del mes de febrero de 1962, COMPARECEN:—DE LA PRIMERA PARTE: DOÑA PETRA MIRANDA, mayor de edad, soltera, de oficios domésticos y vecina de la ciudad de Nueva York, Estado del mismo nombre, Estados Unidos de Norte América; y DE LA SEGUNDA PARTE: DON VÍCTOR LUIS RUIZ MIRANDA, de dieciocho años de edad, soltero, estudiante de la misma vecindad.—Los

comparecientes hacen constar que sus nombres y circunstancias personales son las expresadas, y en tal virtud libre y voluntariamente EXPONEN:—PRIMERO:—EMANCIPACIÓN: Que DON VÍCTOR LUIS RUIZ MIRANDA nació el día 28 de septiembre de 1943 en Ponce, Puerto Rico, hijo legítimo del fenecido RAMÓN RUIZ HERNÁNDEZ Y PETRA MIRANDA, aquí compareciente, encontrándose dicho menor bajo la patria potestad de su señora madre, cuyo nacimiento se inscribió el día 13 de diciembre de 1943, según acta número 3413 del libro número 140 del Registro Demográfico Número 56 de Ponce, Puerto Rico, y considerando la compareciente DOÑA PETRA MIRANDA que su citado hijo tiene capacidad legal necesaria para regir su persona y bienes como si fuera mayor de edad, procede a emanciparlo y por el presente documento lo EMANCIPA para que pueda regir su persona y bienes como si fuera mayor de edad, de acuerdo con los artículos Doscientos treinta y tres y siguientes del Código Civil de Puerto Rico, edición de mil novecientos treinta, queriendo y consintiendo que se tome la correspondiente nota de esta emancipación en el Acta de nacimiento del referido menor. SEGUNDO: El menor VÍCTOR LUIS RUIZ MIRANDA acepta esta emancipación y presta su más formal consentimiento a la misma. Los comparecientes aceptan este documento en la forma redactado, y en señal de aprobación firman el mismo en el sitio y fecha al principio indicados, a presencia de los testigos abajo firmantes.— (fdo.) Luz Mercedes O'Faurie.—WITNESS. Petra Miranda.—PETRA MIRANDA. —José O. Lugo—WITNESS.—Víctor Luis Ruiz Miranda.—VÍCTOR LUIS RUIZ MIRANDA."

El Registrador recurrido admite en su alegato: "la capacidad de los otorgantes del documento de emancipación conforme a nuestro derecho, provocando inscripción la transacción de compraventa; que el documento de emancipación fue otorgado en Nueva York ante un notario de esa ciudad; que el concepto de instrumento público es igual a documento otorgado ante notario y que . . . las formas y solemnidades de los instrumentos públicos se rigen por las leyes del país en que se otorguen según prescribe el Art. 11 del Código Civil . . .". Aclara que el defecto consignado no va encaminado a impugnar la capacidad legal de las personas que intervienen en

el acto emancipatorio. Fundó el defecto en la circunstancia de no haberse acreditado que en el otorgamiento del documento de emancipación se hubieran llenado los requisitos que en cuanto a su forma y solemnidades se exigen por las leyes del Estado de Nueva York.

■ Como acertadamente afirma el letrado de la recurrente el instituto jurídico de la emancipación nunca ha sido regimentado estatutariamente en el Estado de Nueva York. No tiene legislación positiva que regule sus aspectos substantivos o formalistas, internos o externos. Allí, como en otros estados, está gobernada por los principios del derecho común angloamericano, que en muchos sentidos, en esta materia, están discordes con los que la regulan en jurisdicciones de derecho civil. (¹)

En el Estado de Nueva York puede el padre emancipar a su hijo por cualquier clase de escrito, público o privado, o en forma oral, en términos expresos o implícitos, y aun sin formalidad alguna expresa bien escrita o bien oral, si la conducta observada por el padre respecto a su hijo, revela su intención firme de terminar toda clase de relación familiar,

---

(¹) La emancipación en los primeros puede ser por consentimiento expreso o implícito de los padres o por los efectos de la operación de una ley; mientras que en las segundas se exige generalmente el consentimiento expreso tanto el del padre como el del hijo; en los primeros no hay límites para emancipar, respecto a la edad, dándose casos en que los tribunales han considerado emancipado a un menor de cuatro años,— *Murphy* v. *Murphy*, 133 N.Y.S.2d 796, 798 (1954)—mientras que en las segundas se fijan edades mínimas al menor para poder ser emancipado, atendiendo al momento en que se le ha considerado con la capacidad física e intelectual necesaria para valerse por sí mismo como si fuera mayor de edad; en los primeros la emancipación no es nada más que una mera licencia que concede el padre, revocable a voluntad de éste; en las segundas, una vez concedida la emancipación, no podrá ser revocada, se extingue para siempre la patria potestad y jamás podrá ser restablecida. En ciertos casos puede imponerse contra la voluntad de los padres. Art. 235 Código Civil. Distinto al derecho común angloamericano el Derecho Civil no admite condición, término ni modo en la emancipación, ni sus efectos pueden ser configurados a voluntad del emancipante o del emancipado, no siendo posible la emancipación parcial.

dejándose a los tribunales el decidir si con ella se ha producido una emancipación. ([2])

Por lo expuesto concluimos que la emancipación del menor Víctor Luis Ruiz Miranda fue realizada con arreglo a las formas y solemnidades jurídicas relativas a esa clase de actos prevalecientes entonces en el Estado de Nueva York. ([3])

Por otra parte la emancipación cumple plenamente con los requisitos esenciales y formales señalados por nuestro Código Civil para su validez. ([4]) La práctica notarial en Puerto Rico, ajustándose a la antigua legislación civil— Art. 316 del Código Civil de España—siempre ha formalizado el acto emancipatorio por escritura pública; a pesar de que desde el año 1902 nuestra legislación positiva prescindió de la solemnidad de la escritura pública notarial como única y sacramental forma para tener lugar la emancipación, disponiendo en el Art. 303 del Código Civil de ese año—hoy Art. 233 de su vigente edición—en su párrafo segundo:

"Esta emancipación tendrá lugar por la declaración del padre o de la madre, hecha ante notario público en presencia de dos testigos y con el consentimiento del menor."

■ Ante la claridad de esa disposición, que se ha mantenido inalterada por más de sesenta años, y no obstante la preferencia del maestro Muñoz Morales por la clásica formalidad de la escritura pública notarial—véase su obra *Reseña Histórica y Anotaciones al Código Civil*, parte I, págs.

---

([2]) *Crosby* v. *Crosby*, 246 N.Y. Supp. 384; *Boehm* v. *C. M. Gridley & Sons*, 63 N.Y.S.2d 587; *Cohen* v. *Delaware, L. & W. R. Co.*, 269 N.Y. Supp. 667; *Hardy* v. *Eagle*, 54 N.Y. Supp. 1045; *Canovar* v. *Cooper*, 3 Barb. 115; *Giovagnioli* v. *Ft. Orange Const. Co.*, 133 N.Y. Supp. 92; *Murphy* v. *Murphy*, 133 N.Y.S.2d 796, 798 (1954); *Henderson* v. *Henderson*, 169 N.Y.S.2d 106.

([3]) De conformidad con el Art. 6 de la Ley Ejecutiva de Nueva York— Executive Law, Sec. 135, *The Consolidated Laws of New York, Annotated*, Book 18, page 63—todo notario público debidamente nombrado está facultado en todo el estado, entre otras cosas, para autenticar toda clase de documentos *"instruments in writing."*

([4]) Véanse los Arts. 232 y 233 de nuestro Código Civil.

667–668—desde el 1902 se ha podido formalizar la emancipación por medio de una declaración privada autenticada ante notario, otorgada por el padre y el hijo y en presencia de dos testigos. Desde luego, puede obstarse por su formalización en escritura pública, como se ha hecho y se continúa haciendo aquí, sin la necesidad, generalmente de la presencia de testigos, como lo decidimos en *Toro Velázquez* v. *Registrador*, 87 D.P.R. 887 (1963) en el cual, entre otras cosas, sobre este punto, dijimos:

"El Art. 233 del Código Civil, *supra*, fue tomado en la parte que requiere la presencia de testigos, no del Código Civil español, sino del Art. 366 del Código de Luisiana. En España, el Art. 316 requiere que la emancipación por concesión del padre o de la madre se otorgue mediante *escritura pública* o por comparecencia ante el juez municipal. El precepto local no alude a escritura pública específicamente; requiere que el acto se realice mediante 'declaración del padre o de la madre hecha ante notario público.' No es necesario, por tanto, que se haga en escritura pública, y concebiblemente podría efectuarse mediante declaración jurada o afidávit, conforme a la Ley de 12 de marzo de 1903, 4 L.P.R.A. sec. 881 y ss. Es posible que por ello el legislador requiriera la presencia de testigos. Como apuntamos, en Luisiana se dispone que 'This emancipation takes place by the declaration to that effect of the father or mother, before a notary public in presence of two witnesses.' West's *Louisiana Statutes Annotated, (1952), Civil Code,* vol. 2, pág. 537."

■ Cumpliendo el documento de emancipación otorgado en el Estado de Nueva York con las formalidades y solemnidades exigidas para la validez y eficacia de tal acto en Puerto Rico, era innecesario en forma alguna "acreditarse que en el otorgamiento de la escritura de emancipación se hubieren llenado los requisitos que en cuanto a su forma y solemnidades se exigen por las leyes del Estado de Nueva York," como alega el Registrador recurrido quien sostiene el carácter imperativo del Art. 11 de nuestro Código Civil.

Es cierto que allá por el año 1919, en relación con un contrato de venta de un inmueble sito en Puerto Rico, otorgado

en la ciudad de Nueva York, entre dos corporaciones de ese estado, al amparo del Art. 11 de nuestro Código Civil, dijimos en *Rojas, Randall & Co.* v. *Registrador*, 27 D.P.R. 21 (1919); que para su inscripción era necesario demostrar que se habían llenado los requisitos que en cuanto a su forma y solemnidades exigían las leyes de Nueva York, y que si no se demostraba ello constituía un defecto subsanable y uno insubsanable como aducía el Registrador allí recurrido.

A tenor con las tradicionales normas de los ordenamientos jurídicos occidentales referentes a la ley aplicable en cuanto a las formas y solemnidades necesarias para perfeccionar el otorgamiento de un contrato, testamento o cualquier otro documento público en el extranjero, nuestro Código Civil ha recogido en su Art. 11 la doctrina del Derecho Internacional Privado conocida como *locus regit actum* y también como *lex loci actus,* que establece el principio de que en el otorgamiento de un acto o contrato en una jurisdicción extranjera las partes deben cumplir con todas las formas y solemnidades exigidas por las leyes de ese lugar.

Ya en *Armstrong* v. *Armstrong,* 85 D.P.R. 404 (1962) hicimos referencia a aquellos fundamentos y consideraciones que sostienen la doctrina. Señalamos qué bases de tipo práctico más bien que doctrinales fundamentan la misma.

En principio esta doctrina reconoce la existencia de una gran variedad o diversidad de normas diseñadas con el propósito de reglamentar la cuestión de las formas y solemnidades necesarias para efectuar un otorgamiento válido. Reconoce además que muchos sistemas legales han creado instituciones jurídicas especiales para bregar con ese problema y que son, o pueden ser, totalmente desconocidas para otros ordenamientos.

Le sería muy difícil a una persona alejada de su país en ciertas ocasiones, cumplir con todos los requisitos legales de su derecho patrio, porque la persona ante quien se va a realizar un acto o contrato desconoce totalmente esas exigen-

cias, y en otras, porque el ordenamiento jurídico donde se desea efectuar el otorgamiento no dispone de los mecanismos jurídicos formales adecuados o no es capaz de proveer los medios necesarios para que el otorgamiento se ajuste a las exigencias de las leyes de su nación. ([5])

La doctrina no ha pretendido sustituir las exigencias legales externas locales por las de la nación del otorgante, prohibiendo atenerse a las primeras; todo lo que se ha pretendido es evitar que obstáculos similares a los antes señalados impidan a una persona expresar de forma legalmente válida su voluntad.

■ Si en definitiva es la nación de los otorgantes donde el acto o contrato va a surtir todos sus efectos, lo más lógico sería pensar que debía dársele preferencia a las exigencias legales de esa nación y que ante la imposiblidad de cumplirlas se recurra entonces a las establecidas por la jurisdicción del otorgamiento. Manresa, *Comentarios al Código Civil Español*, Tomo I, págs. 179–180. Es por eso que la mayoría de los comentaristas propulsan el que esa doctrina se interprete en forma *facultativa, potestativa* u *opcional*, no en forma *coactiva* o *imperativa*. Véanse Goldschmidt, *Sistema y Filosofía del Derecho Internacional Privado*, 2da. ed. (1954) Tomo II, pág. 208; Miaja, *Derecho Internacional Privado* (1955) Tomo II, pág. 194, Verplaetse, *Derecho Internacional Privado* (1954) pág. 473; Nussbaum, *Principios de Derecho Internacional Privado* (1947) pág. 169; Romero del Prado, *Manual de Derecho Internacional Privado* (1944) Tomo II, pág. 302. A ese respecto señala Rabel en su obra *The Conflict of Laws*, Tomo II, pág. 518 lo siguiente:

---

([5]) Se ha señalado además que una regla en contrario tendría el efecto de exigir que se cumplan con los requisitos formales de todas las naciones o lugares donde el contrato vaya a tener efecto y además que la norma evita el que se anulen contratos otorgados y perfeccionados dentro de un ambiente de absoluta buena fe. Lorenzen, *The Validity of Wills, Deeds and Contracts as Regards Forms in the Conflict of Laws*, 20 Yale L.J. pág. 427.

"Nos hemos dado cuenta, sin embargo, de la necesidad de desarrollar la regla para que pueda tratar con casos modernos realmente típicos. *Cuando las leyes de dos o más territorios estén envueltas en la formación de un contrato, darle preferencia exclusiva a una de ella es tan erróneo como el unir y exigir los requisitos de ambos.* Más bien, *el cumplimiento con una de esas leyes debe ser suficiente.* El problema es uno diferente cuando se trata de determinar el lugar de la contratación a los efectos de encontrar la ley aplicable o la ley que decida si se ha perfeccionado o no un contrato. *El acostumbrado privilegio para mantener la validez formal es uno lógico; por lo tanto debe ser extendido no limitado.*" (Énfasis suplido.)

Si como ya hemos señalado, son consideraciones prácticas, más bien que filosóficas, las que sostienen la doctrina *locus regit actum*, no es difícil percatarse del hecho de que el carácter opcional o facultativo de la misma es más congruente con esas consideraciones o fundamentos.

■ Una vez quede claramente establecido que el otorgamiento de un acto o contrato puede sujetarse a las exigencias de una u otra nación, los otorgantes quedarían en libertad de seleccionar el cumplimiento de aquellas formas y solemnidades que estén más a tono con sus deseos, voluntades y propósitos. Esa caracterización está en armonía, además, con una de las bases fundamentales del Derecho Internacional Privado: facilitar todas las relaciones y transacciones internacionales. Lorenzen, *op. cit.* pág. 456. Lorenzen, *Uniformity Between Latin America and the United States in Rules of Private International Law Relating to Commercial Contracts*, 15 Tul. L. Rev., pag. 165.

Tampoco es difícil percatarse del hecho de que una porción de la utilidad práctica de la regla se perdería o limitaría al caracterizarla como imperativa pues estaríamos obligando a un otorgante a atenerse, sin razón o fundamento alguno, a las leyes del lugar del otorgamiento pudiendo éste cumplir con las leyes de su nación. Es por eso que ya varios estados unos

por vía legislativa y otros jurisprudencialmente, han reconocido y aceptado el carácter facultativo de la norma. (⁶)

Nada se dispuso en el Art. 11 de nuestro Código Civil respecto al carácter facultativo o imperativo de sus disposiciones. Nada tampoco añade a ese respecto su predecesor el Art. 11 del Código Civil español. La opinión de los comentaristas en ese sentido está dividida. La mayoría entiende que, a pesar de que es necesaria una reforma para ajustar el Art. 11 a las exigencias más modernas de esa rama del derecho, ante los claros preceptos de esa disposición legal no debe emerger ninguna duda sobre el *carácter imperativo* de la disposición. Véanse al respecto Yanguas Mesías, *Derecho Internacional Privado* 2da. ed. (1958), págs. 289–290; Lasala Llamas, *Sistema Español de Derecho Internacional e Interregional* (1933), pág. 30; Castán Tobeñas, *Derecho Civil Español, Común y Foral,* Tomo I, vol. I, pág. 501. Por otro lado, tanto Goldschmidt, *op. cit.* pág. 208 como Manresa, *op. cit.* págs. 179–180, entienden que esa disposición es de *carácter facultativo.* Al respecto este último señala lo siguiente:

"Según ya hemos indicado anteriormente siempre que fuese posible, debiera someterse al nacional a la ley de su país, y esto se permite desde el momento en que está provisto el caso de que los actos jurídicos se realicen en el extranjero, sean autorizados por los funcionarios diplomáticos y consulares, que habrán de observar las formalidades de nuestras leyes: *la disposición es pues potestativa en general.*" (Énfasis suplido.)

---

(⁶) Ver el Art. 26 del Código Civil Italiano de 1942, el Art. 11 del Código Civil Griego de 1940, el Art. 5 de la Ley Polaca de 1926; el Art. 11(2) de la Ley Introductoria Alemana de 1896, vigente en la actualidad; el Art. 20 del Código Civil Egipcio y el Art. 7 de la Ley Checoslovaca. La jurisprudencia francesa desde 1909 ha reconocido el carácter facultativo de la doctrina. También en igual sentido se ha pronunciado la jurisprudencia holandesa. Ver Verplaetse, *op. cit.* pág. 474. La Ley Modelo sobre otorgamiento de testamentos ha aceptado la forma opcional, en su Sec. 7, vea 9A *Uniform Laws Annotated* (1957), pág. 347. Ya el Estado de New York ha incorporado en su sistema legal una legislación similar, 13 *McKinney's Laws of New York Annotated,* sec. 22(a), *Armstrong v. Armstrong,* supra.

■ La naturaleza potestativa del Art. 11 de nuestro Código Civil es la que más nos satisface. Como ya hemos expresado su utilidad práctica se limitaría con una interpretación contraria.

El carácter imperativo del Art. 11 de nuestro Código Civil se ajusta más a las exigencias legales de la época en que fue redactado. Hoy día, sin embargo, las necesidades y exigencias del mundo moderno requieren otra interpretación. El acercamiento entre las naciones, resultado de los adelantos alcanzados en el campo de la transportación y en las vías de comunicación ha eliminado muchos obstáculos.

*Se ordenará la inscripción del Título de compraventa libre del defecto subsanable consignado.*

Los Jueces Asociados Señores Rigau y Ramírez Bages disintieron.

—O—

Opinión disidente del Juez Asociado Señor Rigau con la cual concurre el Juez Asociado Señor Ramírez Bages

San Juan, Puerto Rico, a 31 de enero de 1967

Se escribe esta opinión disidente bajo la premisa de que el fin no justifica los medios. Dicha premisa no solamente es una moral sino también jurídica. Prueba de esto último es la existencia, en todos los derechos del mundo, de los códigos y reglas de procedimiento civil y criminal.

Como toda regla tiene excepción y para agotar toda posibilidad hipotética, podemos reducir la anterior premisa a los siguientes términos: El fin no siempre justifica los medios. El caso de autos, sostengo, cae bajo esta premisa.

También se escribe esta opinión bajo la segunda premisa de que el Tribunal Supremo de Puerto Rico, por su alto rango dentro de la jerarquía oficial de nuestra sociedad y por su naturaleza especial de institución rectora de nuestro derecho, viene obligado a tratar el mismo con sumo cuidado. Si fuese posible—por razones que más adelante expondré—dicho cui-

dado debe ser mayor cuando se trata de nuestro derecho civil según éste se encuentra realizado en el Código de ese nombre.

La objeción principal que tengo a la opinión mayoritaria es de orden constitucional y metodológico. Dicho llanamente, no está bien lo que la opinión mayoritaria hace para llegar a la conclusión a que llega. Como trataré de demostrar, es tan peligroso ese error de método que ante su tamaño, el más reducido bien que la decisión aporta no representa una compensación adecuada al perjuicio que la misma inflige a nuestro ordenamiento jurídico. También tengo objeciones de carácter técnico-jurídico a la opinión mayoritaria, las cuales señalaré más adelante.

El problema jurídico presentado por el caso de autos es sencillo. También lo es la disposición de nuestro derecho positivo envuelta en el mismo. Como este caso gira alrededor del Art. 11 del Código Civil, 31 L.P.R.A. sec. 11, conviene releerlo desde ahora. Aunque realmente sólo se trata en este caso del primer párrafo de dicho artículo, como el mismo es breve y para mayor claridad y precisión, lo transcribimos completamente. Dice el Art. 11 del Código Civil:

"Las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos, *se rigen* por las leyes del país en que se otorguen.

"Cuando los actos referidos sean autorizados por funcionarios diplomáticos o consulares de los Estados Unidos en el extranjero, se observarán en su otorgamiento las solemnidades establecidas por las leyes de los Estados Unidos.

"No obstante lo dispuesto en esta sección y en la anterior, las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas, ni por disposiciones o convenciones acordadas en países extranjeros." (Subrayado nuestro.)

Como vamos a remitirnos luego a lo escrito sobre el particular por los tratadistas, conviene también aclarar que el

Art. 11 del Código Civil español es idéntico al nuestro, excepto que, como es de esperarse, donde el nuestro dice "funcionarios diplomáticos o consulares de los Estados Unidos" el Código español se refiere a los funcionarios diplomáticos o consulares de España, y donde el nuestro habla de las leyes de los Estados Unidos el español se refiere a las leyes españolas.

En este caso se trata, en esencia, de un menor de 18 años que fue emancipado en Nueva York. La emancipación se verificó (1) mediante documento escrito, (2) por su madre con patria potestad (su padre había fallecido), (3) con el consentimiento expreso del menor, (4) ante dos testigos y (5) el documento fue debidamente autenticado ante notario.

El menor emancipado y unos hermanos suyos vendieron un inmueble sito en Puerto Rico. El Registrador inscribió el título pero anotó como defecto subsanable que no se acreditó en el otorgamiento de la escritura de emancipación que se hubiesen cumplido los requisitos que en cuanto a su forma y solemnidades se exigen por el Estado de Nueva York, lugar donde se otorgó el instrumento de emancipación.

El Registrador tiene razón. El defecto es subsanable y lo que corresponde hacer es subsanarlo. Así ya lo habíamos resuelto antes. *Rojas, Randall & Co.* v. *Registrador*, 27 D.P.R. 21 (1919). Allí dijimos a las págs. 23 y 24:

"Tampoco el documento demuestra, y en ello estamos conformes con el registrador, que se hayan llenado los requisitos necesarios en cuanto a forma y solemnidad requeridas por las leyes del Estado de New York para el traspaso de bienes inmuebles. A la parte interesada incumbía acreditar ese extremo, y no habiéndolo hecho así la omisión constituye un defecto subsanable que no impide la inscripción solicitada."

Sin embargo, ¿qué resuelve la opinión mayoritaria? La opinión mayoritaria, a pesar de la disposición terminante y clara del Art. 11 del Código Civil, en el sentido de que "Las formas y solemnidades de los contratos, testamentos y demás

instrumentos públicos, se rigen por las leyes del país en que se otorguen," expresa—la opinión—que esa disposición del Código es de naturaleza potestativa, esto es, discrecional; que no es mandatoria. Resuelve la opinión mayoritaria que como la emancipación hecha en Nueva York cumple con los requisitos *formales* exigidos para las emancipaciones hechas en Puerto Rico, por lo tanto la misma es inscribible sin defecto subsanable alguno.

Como dije antes, tengo dos objeciones mayores a la opinión mayoritaria. Una es de carácter técnico-jurídico. Esto es, como cuestión de derecho, la opinión mayoritaria es, a mi modo de ver, errónea. Trataré de demostrarlo con las mismas autoridades que la opinión mayoritaria cita, además de añadir otras. La otra objeción, dije, es de naturaleza constitucional y metodológica. Al discutir ésta trataré de demostrar por qué no se justifica ni es aconsejable violentar en la forma que dicha opinión violenta nuestro sistema de derecho civil y que, por el contrario, ello es perjudicial a nuestro derecho. Veamos primero la objeción de derecho que formulo a la opinión mayoritaria.

La controversia gira, en este aspecto, en cuanto a la naturaleza del Art. 11 del Código Civil. La opinión mayoritaria sostiene que dicho artículo es discrecional. Yo sostengo que es imperativo. Muchos de estos conflictos de interpretación de estatutos podrían evitarse si lo primero que se hiciese fuese leer la propia ley. Por eso hemos copiado dicho artículo al comienzo de esta opinión. Nótese que el Art. 11 no dice que los instrumentos *podrán* regirse por las leyes del país en que se otorguen, sino que dice que *se rigen* por las leyes del país en que se otorguen. En forma más positiva y clara no pudo decirlo el Código. Lo que la opinión mayoritaria propone no es una nueva interpretación, sino una nueva redacción. Pero esto último es parte del argumento que hemos dejado para el segundo término. Ahora estamos considerando la naturaleza del Art. 11.

La opinión mayoritaria cita unos comentaristas de derecho civil y de derecho internacional privado. Veamos qué dicen esos comentaristas. Los primeros siete que voy a mencionar están citados en la opinión mayoritaria. Comencemos con el internacionalmente conocido estudioso del derecho internacional privado, Ernst Rabel. Dicho autor sostiene la posición que aquí sostengo, esto es, que el Art. 11 es imperativo. Es más, dice que *en Puerto Rico* y en España es imperativo. Veamos sus propias palabras:

> "[L]*ocus regit actum acquired compulsory force*. Whatever law may govern the contract in other respects, *the law of the place* where it is made *always determines* whether any formalities are obligatory, and if so, which are required. *In this shape as imperative,* the rule was recognized for a long time in England, and appears in a number of countries." (Subrayado nuestro.)

Al final de esa cita el autor coloca su escolio número 5 en donde menciona los países en que la disposición aquí discutida es imperativa. En dicho escolio menciona específicamenta a Puerto Rico, a España, y a más de otros diez países de derecho civil. ([1])

El segundo autor citado que vamos a examinar es otro comentarista del derecho internacional privado, Julian E. Verplaetse. Este autor también concluye que la disposición del Art. 11 es imperativa. En la sección dedicada al derecho español de conflicto de leyes de su tratado, al discutir precisamente la naturaleza de la disposición que aquí nos ocupa se expresa como sigue:

> "Como ya hemos apuntado no parece existir disenso al respecto entre los autores: el sistema positivo español debe interpretarse como imperativo."—*Derecho Internacional Privado*, (1954) pág. 487.

Otro autor citado en la opinión mayoritaria es Arthur Nussbaum, *Principios de Derecho Internacional Privado*,

---

([1])Rabel, *The Conflict of Laws*, Vol. 2 (ed. 1960) pág. 488. En la edición de 1947, pág. 486.

ed. española (1947). Escribiendo sobre la ley aplicable a la forma de los actos jurídicos en su citada obra, dice el autor, a las págs. 167–168:

"Tanto en el sistema del derecho consuetudinario como en el del derecho civil, es un procedimiento común separar la 'forma' de la 'substancia' de un acto jurídico, y sobre la base de esta diferenciación, contrastar su validez 'extrínseca' e 'intrínseca'. A través del régimen de los conflictos de leyes esta cuestión se hace sentir en testamentos, contratos, ciertos instrumentos (deeds) y matrimonios. El problema consiste en establecer si las formalidades de una transacción pueden estar gobernadas por otra ley que la que controla su substancia. *El sistema del derecho civil* ha dado hace mucho *una rotunda contestación afirmativa.* Desde el tiempo de Bartolo se acepta que las formalidades de una transacción y los efectos de su inobservancia están gobernados por la ley *del lugar* donde se ha concluído *(lex loci actus)*, y esta amplia proposición, llamada más tarde *locus regit actum,* ha llegado a ser un bien establecido y característico aspecto del derecho privado continental europeo. Ha sido incorporada a muchos códigos, particularmente al alemán, italiano, brasileño y japonés.

"El derecho consuetudinario no tiene ninguna regla general similar, pero se está orientando claramente hacia ella, de modo que la brecha entre los dos grandes sistemas ha disminuído considerablemente al respecto. Contratos y matrimonios que son válidos bajo la *lex loci actus,* son así reconocidos en Inglaterra y en los Estados Unidos de Norte América." (Subrayado nuestro.)

Otra obra citada es el *Manual de Derecho Internacional Privado* (1944), de Romero Del Prado, Tomo 2. En cuanto a la naturaleza imperativa o facultativa *de la regla* "locus regit actum" que es la recogida en el Art. 11 del Código Civil de Puerto Rico, en el Código Civil español y en casi todos los códigos civiles, manifiesta su criterio de que para làs formas "ad-probationem" debe aplicarse dicha regla y que para las formas "ad-solemnitatem" no debe aplicarse, *salvo que otra cosa se disponga por ley.* Reconoce, pues, dicho autor, como es natural que reconozca, que la regla ha de ser imperativa o no

según se disponga por ley. Ya sabemos lo que dispone la ley en Puerto Rico, de manera que no puede decirse que Romero expresa que nuestro Art. 11 sea de carácter facultativo. Por el contrario, la conclusión lógica de su explicación es que en Puerto Rico la regla es imperativa porque así está dispuesta por ley. La discusión mencionada aparece en las págs. 302–303 de su citada obra.

Otro autor citado es Adolfo Miaja, *Derecho Internacional Privado* (1955), Tomo 2. Luego de señalar que "la doctrina más generalizada es la de la imperatividad," y luego de citar en ese sentido a los tratadistas Lasala Llamas, Trías De Bes, Yanguas y Verplaetse, concluye Miaja diciendo "Nos parece esta opinión la más ajustada *a nuestro derecho positivo.* ..." Págs. 194–195 de la obra citada.

Goldschmidt en su *Sistema y Filosofía del Derecho Internacional Privado* (1954) Tomo 2, discute los conceptos de forma y contenido de los instrumentos. Prefiere la forma facultativa de la regla *locus regit actum* pero reconoce que el primer párrafo del Art. 11 "establece que las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos *se rigen por las leyes del país en que se otorguen.*" (Subrayado nuestro.) Obra citada, pág. 201. Señala que el Art. 11 contiene una excepción al declarar en su segundo párrafo que cuando los instrumentos sean autorizados por funcionarios diplomáticos o consulares de España en el extranjero, se observarán en su otorgamiento las solemnidades establecidas por las leyes españolas. Como hemos visto, nuestro Código contiene una excepción similar.

Cuando Manresa dice que la disposición del Art. 11 es potestativa no está utilizando el concepto en la misma forma en que lo entiende la opinión mayoritaria. Lo que Manresa señala es que el Art. 11 *permite* al nacional español que otorga un instrumento en el extranjero someterse a la ley de su país si otorga el mismo ante funcionarios diplomáticos o consulares de España. Esto es, no sostiene Manresa que la

aplicación del artículo es discrecional. Sostiene que el Art. 11, en virtud de su segundo párrafo, *permite una excepción* a la regla general establecida en su párrafo primero. En otras palabras, lo que señala es que es potestativo del nacional español que otorga un instrumento en el extranjero observar las formalidades de la ley del país en que otorga el documento (primer párrafo del Art. 11) u observar las formalidades requeridas por la ley española si concurre ante un funcionario diplomático o consular español. Manresa, *Comentarios al Código Civil Español*, Tomo 1 (1956) pág. 240. En la edición de 1943, pág. 180. Como hemos ya señalado, similar potestad concede nuestro propio Art. 11.

Don José Castán Tobeñas, Juez Presidente del Tribunal Supremo de España, ha escrito sobre el particular:

"La legislación española adopta sin vacilación, con respecto a las formas extrínsecas de los negocios jurídicos, la antigua regla *locus regit actum*, tomada de la teoría estatutaria. El art. 11, párrafo 1.°, prescribe que 'las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos se rigen por las leyes del país en que se otorguen.' Aunque la expresión legal es incompleta, hay que entender que toda clase de actos jurídicos, sea cualquiera su forma, pública, privada o verbal, están sujetos a la regla tradicional *locus regit actum*.

"Hay un caso en que el Estatuto formal es potestativo, pues dice el Código que cuando los actos 'sean autorizados por funcionarios diplomáticos o consulares de España en el extranjero, se observarán en su otorgamiento las solemnidades establecidas por las leyes españolas' (art. 11, párrafo segundo)."—*Derecho Civil Español, Común y Foral*, Tomo 1, Vol. 1, 10ma. ed. (1962) págs. 500–501. En la novena edición (1955), Tomo 1, Vol. 1, págs. 446–447.

Otro Magistrado del Tribunal Supremo de España y también profesor de derecho civil, Don Francisco Bonet Ramón, al comentar el Art. 11 escribe:

"[S]e comprende igualmente que considere natural la observancia del lugar del otorgamiento, ya que, en efecto, ante un

Notario de aquel lugar difícilmente podía observarse una forma diferente.

"Por ello hay que entender que la regla *locus regit actum* se refiere desde luego a todos los actos lícitos. Dentro del grupo de los negocios jurídicos, se extiende tanto al negocio unilateral (p. ej., testamento, despido en un contrato de arrendamiento de servicios, etc.) como al multilateral . . ."—*Código Civil Comentado*, (1962) pág. 58.

Como los demás autores, Bonet Ramón, en su *Compendio de Derecho Civil* (1959) Tomo I, pág. 232, concluye que "Según el párrafo primero del artículo 11 del Código Civil, las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos se rigen, por las Leyes del país en que se otorguen."

Puede verse que el Art. 11 tanto (1) por su letra expresa y clara, (2) como por su origen histórico, (²) (3) como por el criterio casi universal de la doctrina, es de naturaleza imperativa. Esa es la regla del derecho civil. Por el contrario, el derecho común anglosajón no reconoce ninguna regla con primacía aunque en general puede decirse que en cuanto a sucesiones gobierna la regla *lex rei citae*. Sin embargo el derecho común se está acercando a la regla del derecho civil, *locus regit actum*. Rabel señala que la mayor parte de los estados de la Unión americana ya han incorporado *legislativamente* dicha norma a su derecho. (³)

Yerra, pues, la opinión mayoritaria al entender que el Art. 11 del Código Civil es discrecional. Dicho artículo es imperativo.

---

(²) Podemos trazar brevemente así los antecedentes del Art. 11 de nuestro Código Civil: Art. 11 Código Civil español (1888); Novísima Recopilación, Libro X, Título XX, Ley 18 (1805); Las Partidas, Partida III, Título 18, Ley 111 (1256-1265); los estatutarios, especialmente Bartolo, siglo XII.

(³) V. 6 Vand. L. Rev. 533-542. V. también Lorenzen en 20 Yale L.J. 432.

## II.

Pasemos ahora a la segunda objeción que formulo a la opinión mayoritaria. Ésta es la de orden constitucional y metodológico. La opinión mayoritaria, como he señalado, hace una enmienda directa al Código Civil. Al hacerlo, claro está, viola el Art. 14 de dicho Código el cual preceptúa que cuando la ley es clara su letra no debe ser menospreciada bajo el pretexto de cumplir su espíritu. En este caso no se trata ni aún siquiera de una tentativa de cumplir su espíritu, o sea, su intención. Ese primer párrafo del Art. 11 es explícito y su intención surge claramente de su propia letra. Si no bastase con la letra clara y explícita del artículo—debía bastar—ahí está su historial y la doctrina española y extranjera, la cual hemos reseñado. Pero lo que considero más serio y objetable en la opinión mayoritaria—y ésta es mi objeción mayor—es que es contraria a nuestro sistema constitucional y contraria y perjudicial a nuestro sistema jurídico. Es contraria a nuestro sistema constitucional porque es a la Asamblea Legislativa a quien corresponde hacer las enmiendas directas a la ley escrita en Puerto Rico. Es contraria y perjudicial a nuestro sistema jurídico porque ésta es una jurisdicción de derecho civil y de derecho escrito y la opinión mayoritaria introduce en nuestro derecho civil la forma cruda de enmendar sin ambages el Código Civil mediante casos, forma más propia de derechos menos maduros. ([4])

En nuestro sistema constitucional, que es uno democrático-representativo, son los departamentos políticos del gobierno—el Legislativo y el Ejecutivo—a los que corresponde legislar. Esto no es así por capricho sino que es una consecuencia necesaria del sistema democrático. Hacer la ley es

---

([4]) No solamente opinan así los tratadistas de derecho civil sino que eminentísimos juristas del derecho común anglosajón han concluido lo mismo. V.g. Pound, "It [legislation] is the characteristic mode of law-making in matured systems."—*The Formative Era of American Law* (1938) pág. 71.

hacer política pública y corresponde hacerla primordialmente al Legislativo y al Ejecutivo porque son éstos los dos departamentos del gobierno que están sujetos periódicamente al endoso o rechazo del pueblo a través de los comicios electorales y son por eso directamente responsables al pueblo. (5) Uniformemente se reconoce en los países de derecho civil la supremacía de la ley escrita y aun en los países tradicionalmente de derecho consuetudinario cuando el órgano legislativo decreta legislación se le reconoce a ésta la preeminencia por representar dicha legislación la más explícita formulación de la política pública. (6)

La función primordial del departamento judicial es la de resolver casos y controversias y, naturalmente, para ello ha de aplicar la ley y ha de interpretarla cuando sea necesario. Sin embargo, es claro que el arbitrio judicial no es absoluto. Como todas las cosas, la discreción judicial tiene sus límites. Si se relevara a los órganos judiciales de la

---

(5) Cuán necesario es para el Juez tener un claro concepto de la teoría política democrática para distinguir la línea que separa la adjudicación de la legislación. Como señala Frankfurter en su ya clásico ensayo, la única salvaguarda que evita que el Juez se exceda de sus límites judiciales es su propia conciencia alerta y entrenada. Véase "Some Reflections on the Reading of Statutes," 47 Col. L. Rev. 527 (1947). Sobre la teoría política democrática véase Coker, *Recent Political Thought*, Cap. X "The Democratic Tradition" y Cap. XIX "Law and the State," (1934) ; Locke, *Second Treatises of Civil Government* (1690) ; Lindsay, A. D., *The Modern Democratic State* (1943) ; Mill, John Stuart, *Representative Government* (1861) ; Bentham, *A Fragment on Government* (1776) ; Finer, *Theory and Practice of Modern Government*, ed. rev. 1960; Friedrich, *Constitutional Government and Democracy*, ed. rev. 1950. V. también, Hand, L., *"Sources of Tolerance,"* 79 U. Pa. L. Rev. 1, 12 (1930), reimpreso en *The Spirit of Liberty* (ed. Dillard 1952) págs. 66, 81.

(6) Abundan los casos del Tribunal Supremo de los Estados Unidos en donde esto se reconoce. Para una reciente expresión de dicho Tribunal véase *Switzerland Assn.* v. *Horne's Market*, 385 U.S. 23, 25, 35 L.W. 4001 (1966). Allí al sostener una pieza legislativa el Tribunal Supremo usó estas palabras: "We see no other way to protect the integrity of the congressional policy . . ." Bien se ha dicho: "In the day-to-day working of our democracy it is vital that the power of the non-democratic organ of our Government be exercised with rigorous self-restraint." 335 U.S. 555.

subordinación a la ley y éstos pudiesen hacer enmiendas a ésta so color de que son convenientes, se caería en la desafortunada situación de que se perdería la certeza del derecho y su valor objetivo e impersonal, que es por sí una preciosa garantía de la libertad. La pretendida libertad del juez de modificar la ley se resolvería esencialmente en la negación de la verdadera libertad, que es la libertad bajo la ley democráticamente formulada, conocida por todos y aplicada a todos por igual. (⁷)

Resulta claro que no conviene al estado de derecho que el Código Civil pierda su certeza para convertirse en lo que en cada ocasión una mayoría de un tribunal determine qué redacción le satisface más. Si se aceptase esa manera de aplicar la ley ¿quedaría entonces alguna oración en todo el Código que valga lo que vale el papel en que está impreso? Si la mayoría del Tribunal puede enmendar directamente la primera oración del Art. 11 ¿por qué no podría enmendar cualquiera otra disposición del Código? Si eso fuese así el Código ya no diría jamás lo que su propio texto prescribe. Como se sabe, el Código Civil trata de instituciones sumamente importantes para la vida de los individuos y de la sociedad, tales como el matrimonio, el divorcio, las sucesiones, la contratación, las relaciones de familia, etc. Conviene a los mejores intereses públicos que esa legislación sólo pueda ser enmendada por la Asamblea Legislativa que es el órgano responsable al pueblo.

Como debe saberse ya, no soy de los que creen que la ley debe aplicarse conforme los postulados de la anacrónica escuela analítica. Creo más bien en la aplicación de la ley en la forma en que la entienden los juristas de la escuela sociológica. En cuanto a nuestro Código Civil se refiere, he expresado antes que debemos interpretarlo con imaginación

---

(⁷) Véase sobre esto, Castán, *La Formulación Judicial del Derecho*, ed. 1954, pág. 116 y Del Vecchio, *Filosofía del Derecho*, trad. de Recaséns, t. 1, pág. 309 (1929).

para impartirle flexibilidad y revitalizarlo de manera de asegurar su permanencia ya que dicho cuerpo legal es una de nuestras piezas legislativas más terminadas y valiosas. *Borges* v. *Registrador*, 91 D.P.R. 112 (1964).

Sin embargo, allí mismo, en *Borges*, señalamos que "No le estamos haciendo violencia al articulado del Código Civil" pues allí actuamos dentro del propio articulado del mismo. Una cosa es la aplicación e interpretación judicial de la ley escrita, lo cual es necesario y permisible en los países de derecho civil, y otra cosa es la libre formulación del derecho por los tribunales en los países de derecho consuetudinario cuando no tienen legislación expresa sobre el asunto bajo consideración. El juez cuidadoso tendrá siempre estas diferencias en mente según aplique el derecho civil o el derecho consuetudinario. (⁸) Lo que propone la opinión mayoritaria, como he señalado antes, no es una interpretación sino una nueva redacción y le hace violencia al texto escrito y a todo el espíritu que informa el derecho civil.

Una distinguida estudiosa de estos problemas ha escrito:

"There is a great deal of difference between acceptance of a law of precedents largely in-lieu-of statutory law according to the common law pattern and its use in aid of statutory law according to the civil law model.

. . . . . . . .

"Apart from the area of constitutional decision making, statutory law creation is rapidly taking over traditional spheres of the common law. The law creativeness of a judicial decision within a system of largely statutory law is, of course, quite different in scope from that of a decision operating within a system of common law. To the extent that statutes can be formulated without undue verbosity and ambiguity, they are preferable to common law dispositions."—Silving, trabajo citado en el escolio 8, págs. 195, 241–242.

---

(⁸) Silving, Helen, *"Stare Decisis in the Civil Law and in the Common Law,"* 35 Rev. Jur. U.P.R. 195 (1966); Castán, *"En Torno al Derecho Civil de Puerto Rico,"* 26 Rev. Jur. U.P.R. 7 (1956).

Algunos autores proponen que los códigos sean enmendados para que el Art. 11 cobre mayor flexibilidad. Creo deseable esa reforma legislativa del Art. 11. En Estados Unidos la Ley Modelo sobre otorgamiento de testamentos consagra la norma civilista *locus regit actum* y también reconoce la validez del testamento ejecutado de acuerdo con la ley vigente en el domicilio del testador al momento de testar. El Estado de Nueva York ha adoptado *legislativamente* la regla *locus regit actum* y una disposición similar a la de la Ley Modelo. Para las autoridades correspondientes a estos particulares véase *Armstrong* v. *Armstrong*, 85 D.P.R. 404, a las págs. 410-412 (1962) en donde examinamos detenidamente estas cuestiones.

Si se desea enmendar el Código Civil sobre este particular basta con gestionar una breve y no controvertible enmienda legislativa a la primera oración del Art. 11. Eso muy bien puede gestionarlo y conseguirlo el Departamento de Justicia. Preparar y gestionar legislación para la reforma de nuestro derecho escrito, es una de las funciones de los Ministerios de Justicia. Véanse, Cardozo, *"A Ministry of Justice"*;[9] Castán, *Derecho Civil Español, Común y Foral,* tomo I, vol. 1, 10ma. ed. 1962, pág. 194; Trías Monge, *"Derecho y Justicia en Puerto Rico,"* 25 Rev. C. Abo. P.R. 417 (1965); Pound, *Jurisprudence* (1959) Vol. 1, pág. 356, Vol. III, pág. 600.

Esa—la enmienda legislativa—es la forma correcta de enmendar un Código Civil. La Ley de Bases de 11 de mayo de 1888, la cual autorizó la redacción del Código Civil español por la Comisión de Códigos, en su base 27 dispuso un sistema de revisiones periódicas del Código y el propio Código Civil español en sus Disposiciones Adicionales dispone que el Presidente del Tribunal Supremo y los de las Audiencias Territoriales han de elevar, al fin de cada año, al Ministro de Gracia y Justicia una Memoria informativa de las deficiencias y dudas que las Salas de lo Civil hayan encontrado al

---

(9) 35 Harv. L. Rev. 113.

aplicar el Código, y en vista de los datos que así se obtengan, de los progresos realizados en otros países que sean utilizables y de la jurisprudencia del Tribunal Supremo, la Comisión de Codificación formulará y elevará al Gobierno las reformas que convenga introducir.

El escolio número 6 de la propia opinión mayoritaria implícitamente sostiene mi posición. Señala cómo varios países han enmendado *legislativamente* sus códigos y leyes para reformar la disposición legislativa que aquí discutimos, a saber, Italia, Grecia, Polonia, Alemania, Egipto y Checoslovaquia. Aun en Nueva York, jurisdicción de derecho consuetudinario, se ha hecho dicha reforma mediante enmienda legislativa. Sin embargo, aquí, en una jurisdicción de derecho civil, se pretende enmendar el Código con una opinión. Por excepción, en Francia se ha podido hacer la aquí discutida reforma mediante acción jurisprudencial porque el Código francés no contiene una disposición expresa al efecto, contrario al Código puertorriqueño y a otros muchos.[10]

Lo dicho hasta aquí debe servir para recordar que el Tribunal no debe funcionar como un "organismo exclusivamente de poder." Constituimos un tribunal de derecho y esto nos impone una ineludible responsabilidad para con la disciplina jurídica. Ya antes se nos ha recordado esto desde afuera.[11] Debemos recordarlo nosotros desde dentro.

Además de las consideraciones técnicas, metodológicas y constitucionales que he mencionado, hay otra consideración que el Tribunal Supremo de Puerto Rico no puede perder de vista. Ésta es una consideración jurídica en el más profundo sentido de la palabra. Cuando el Gran Descubridor hincó en esta tierra su pendón sembró aquí la simiente del derecho civil. Ésta es una jurisdicción de derecho civil. Nuestro Código

---

[10] Romero, obra citada, pág. 294.

[11] Alonso, Rafael, Comentario al caso de Hernández v. Cuevas Viret y Asociación de Empleados resuelto en 27 de junio de 1963, 33 Rev. Jur. U.P.R. 451, 469 (1964).

Civil es uno de nuestros mayores valores jurídicos. Eso de por sí bastaría para que el foro y la judicatura puertorriqueña velasen por él. Eso es aún más necesario por tratarse aquí de una sociedad en donde coexisten los dos grandes sistemas jurídicos occidentales, el derecho civil y el derecho común anglosajón.(12) Es masivo el influjo en nuestro derecho del "common law." Esto es así, en grandísima medida, por la gran pujanza económica que tienen en nuestros días los países en donde rige ese derecho. Claro está, ese influjo es muchas veces conveniente. Otras veces no lo es. En el campo jurídico, ¿a quién es, si no es a este Tribunal, al que le toca velar por esas diferencias?

Es un error aplicar indiscriminadamente técnicas casuísticas del derecho común anglosajón a la elaboración del derecho civil. No hay duda de que la jurisprudencia tiene su papel creador en ambos sistemas de derecho pero es preciso notar las diferencias. La técnica casuística es útil en el derecho civil para llenar lagunas y al aplicar e interpretar la norma positiva, pero no debe utilizarse para substituirla. Hace mal el Tribunal al permitir la enmienda directa al articulado del Código porque es posible que se inicie así impensadamente una práctica que andando el tiempo puede con-

---

(12) Digo "derecho común anglosajón" cuando me refiero al "common law" para distinguirlo del derecho común de los países europeos-continentales. El propio Código Civil español reconoce el Derecho Común Español, Arts. 15 y 1976. El conocido tratado de Derecho Civil de Castán se titula *Derecho Civil Español, Común y Foral.* Un autor escocés se expresa como sigue:

"I decline to regard the expression 'common law' as the monopoly of Anglo-American lawyers. All European civilian systems have had their common law, and in the era before codification there was virtually a common law of Europe."—Smith, "The Preservation of the Civilian Tradition in Mixed Jurisdiction," en *Civil Law in the Modern World,* Yiannopoulos, Ed. (1965) pág. 3, reimpreso en 35 Rev. Jur. U.P.R. 263, 266 (1966).

Véanse además, Castán, obra citada, Tomo 1, Vol. 1 (1962) pág. 129; Sánchez Román, *Estudios de Derecho Civil,* Tomo 1 (1899) pág. 67.

ducir a la eventual destrucción de nuestro derecho civil.

Al reflexionar sobre el quehacer jurídico en Puerto Rico, dada la circunstancia de que operan aquí el derecho civil y el derecho común anglosajón, y al considerar que "tal vez reserve el porvenir a la cultura jurídica de vuestro pueblo misiones transcendentalísimas . . . y a que se llegue a encontrar una síntesis feliz" Castán nos advierte que "esta aspiración ambiciosa requerirá un largo camino que habréis de seguir con mucha prudencia y parsimonia." (13) Creo que está ausente la debida prudencia en la manera de resolver que en este caso utiliza la opinión mayoritaria de la cual disiento.

Un estudioso puertorriqueño de nuestro Derecho, también preocupado por ésta, que debe ser preocupación importante de este Tribunal, ha escrito:

"El derecho civil en Puerto Rico corre peligro de desvitalizarse. Vastas zonas del mismo, . . . se han cedido, sin razón válida para ello, a la jurisprudencia norteamericana. Conceptos del derecho común también matizan y afectan otras instituciones de nuestro derecho civil, no porque los postulados de nuestra sociedad así lo exijan, sino por pereza o descuido o indebido aprecio de los valores envueltos. La pérdida o corrupción del derecho de un país acarrea consecuencias tan graves como las que produce el olvido o la adulteración de su lenguaje. Independientemente de la posición que se sostenga sobre la solución del destino político de este pueblo, es responsabilidad de nuestra clase velar por la salud y el enriquecimiento de nuestras instituciones jurídicas. La sustitución o aún la alteración de figuras del derecho civil por principios del derecho común o de otros derechos es enteramente aceptable si es que en consecuencia se ha de servir mejor los intereses del país, pero no si el desplazamiento ocurre por pura

---

(13) "En Torno al Derecho Civil de Puerto Rico," 26 Rev. Jur. U.P.R. 7, 17 (1956).

Ya anteriormente nos hemos ocupado, aunque ligeramente, de nuestro deber ineludible de ir elaborando "una síntesis" de los dos sistemas jurídicos antes mencionados. *Barreras* v. *Santana,* 87 D.P.R. 227 res. en 8 febrero 1963 y el escolio número 1 de dicha opinión.

acción sonámbula o avance desatendido del proceso de asimilación jurídica." [14]

Las anteriores consideraciones y el conocimiento que tengo que suponerle a los miembros del Tribunal de las condiciones en que se desenvuelve nuestro Derecho, deben ser más que suficientes para que aprecien la necesidad de evitar que las técnicas del derecho común anglosajón, muy propias de aquel derecho, tengan, corriendo el tiempo, el resultado de desvitalizar y adulterar nuestro derecho civil hasta hacerlo irreconocible. Bréguese sobre ésto con la prudencia que nos recomienda don José Castán Tobeñas. [15]

La vida y supervivencia del derecho civil en aquellos lugares en que coexiste con el derecho común anglosajón ha sido y es objeto de preocupación y consideración por juristas de diversas procedencias. Además de los cuatro trabajos antes citados de Castán, Trías, Silving y Smith, véanse Baudouin, *"Le Code Civil Quebecois: Crise de Croissance ou Crise de Vieillese,"* 44 Can. B. Rev. 391 (1966); Azard, *"Le Probleme Des Sources Du Droit Civil Dans La Province de Quebec,"* 44 Can. B. Rev. 417 (1966); Hood, *"Louisiana and the Civil Law: A Crossroad in Louisiana History,"* 22 La. L. Rev. 709 (1962); Tate, *"Techniques of Judicial Interpretation in Louisiana,"* 22 La. L. Rev. 727 (1962); Ortiz, *"El Derecho Como Vehículo de Expresión de Nuestra Cultura,"* 5 Rev. C. Abo. P.R. 133 (1940); Rodríguez Ramos, *"Reexamen del Precedente Judicial en Puerto Rico,"* 15 Rev. C. Abo. P.R. 7 (1954); Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico,* 1947; Muñoz Morales, *Compendio de Legislación Puertorriqueña y sus Precedentes,* 1948; Rodríguez Ramos, *"Breve Historia de los Códigos Puertorriqueños,"* 19 Rev. Jur. U.P.R. 233 (1950); Fried-

---

[14] Trías Monge, *"Derecho y Justicia en Puerto Rico,"* 25 Rev. C. Abo. P.R. 417, 418 (1965).

[15] Trabajo citado en el escolio 11.

mann, W., *"Stare Decisis at Common Law and Under the Civil Code of Quebec,"* 31 Can. B. Rev. 723 (1953).

Resumiendo: Como cuestión de derecho yerra la opinión mayoritaria al concluir que el Art. 11 del Código Civil es meramente facultativo, pues el mismo es imperativo. Esto lo sostiene su propia letra clara y explícita, su historial y la doctrina, española y extranjera.

Como cuestión de política pública, tanto en el orden constitucional como en el orden jurídico, dicha opinión mayoritaria es objetable pues es contraria a nuestro sistema constitucional de legislar—que fija primordialmente esta función en el organismo legislativo y además le hace lesión a nuestro sistema de derecho civil al introducir el modo de enmendar el Código mediante casos, modo propio de otros sistemas de derecho pero que mal cuadra al nuestro.

Creo que para conseguir mediante una opinión una pequeña reforma al Art. 11 del Código Civil, el Tribunal no debe comprometer dos valores de primer orden en la vida puertorriqueña: (1) nuestro sistema constitucional de legislar y (2) nuestro derecho civil y su propia e inherente metodología jurídica.