# 2006 DTA 120

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE BAYAMÓN**
**PANEL VI**

CARLOS ROSELLÓ PUIG
Demandante-Peticionario

v.

RUTH N. RODRÍGUEZ CRUZ
Demandada-Recurrida

Núm. KLCE-2005-00488

San Juan, Puerto Rico, a 29 de septiembre de 2006

Panel integrado por su Presidente, el Juez Martínez Torres,
el Juez Brau Ramírez y la Juez Fraticelli Torres

Fraticelli Torres, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

En el caso de autos debemos determinar si dos cónyuges puertorriqueños, sujetos al régimen de sociedad de gananciales, pueden suscribir un contrato de compraventa simulado de un bien inmueble ganancial, sito en el estado de Florida, para transferir gratuitamente su titularidad exclusiva a la esposa, con el propósito de excluir el bien del caudal ganancial y evitar su embargo o pérdida a manos de terceros que puedan demandar a la sociedad por actos del marido.

De entrada, la respuesta a esta interrogante parece simple, pero permitiendo la ley del estado de Florida, donde ubica el inmueble, que los cónyuges puedan transferirse bienes entre sí, razón por la que pudieron realizar el aludido acto jurídico, la contestación a esta cuestión no es tan llana. La controversia contrapone la aparente validez del contrato en el lugar en que fue celebrado a las normas de derecho imperativo que rigen las relaciones entre cónyuges en Puerto Rico. Éstas prohíben de manera absoluta que los cónyuges puedan donarse bienes entre sí, sin importar el régimen económico que regule el matrimonio ni la naturaleza de la liberalidad. El asunto está gobernado, pues, por los artículos 9, 10 y 11 del Código Civil de Puerto Rico, 31 L.P.R.A. secs. 9, 10 y 11, que regulan las normas de derecho aplicables al estado civil, a los bienes y a los actos y negocios jurídicos otorgados por los ciudadanos o domiciliados de Puerto Rico; el Artículo 1295, 31 L.P.R.A. sec. 3621, que determina la naturaleza ganancial de los bienes adquiridos durante un matrimonio sujeto al régimen de sociedad legal de gananciales; los artículos 1286 y 1347, 31 L.P.R.A. secs. 3588 y 3772, que proscriben la donación entre cónyuges; y la jurisprudencia interpretativa.

El recurso de autos se presentó como una petición de *certiorari* porque el dictamen, aunque se tituló sentencia, es una resolución interlocutoria que únicamente resuelve la controversia relativa al bien inmueble en cuestión. El foro recurrido resolvió que la transferencia de titularidad fue válida y que el bien así enajenado era privativo de la señora Rodríguez.

Luego de un fragmentado proceso apelativo y con el beneficio de la comparecencia escrita de ambas partes, resolvemos revocar la sentencia recurrida. El acto jurídico impugnado, aunque haya producido efectos ante terceros de buena fe, no puede borrar la prohibición de la liberalidad en Puerto Rico ni la naturaleza ganancial del bien así enajenado. Su valor debe traerse a las operaciones liquidatorias de la sociedad de bienes gananciales que los litigantes tenían constituida entre ellos cuando se realizó la venta o donación, y debe colacionarse como corresponde, para fijar la participación de cada ex cónyuge en esa parte del caudal ganancial.

Para fundamentar nuestra determinación, se impone la explicación detallada de los hechos que originan y dan lugar al acto impugnado por el peticionario.

El acto jurídico que suscita el presente recurso aconteció durante el matrimonio del señor Roselló y la señora Rodríguez. Ambos son puertorriqueños domiciliados en Puerto Rico y contrajeron matrimonio bajo el régimen económico de la sociedad de gananciales el 25 de junio de 1978 en San Juan. Luego de casados, el matrimonio vivió y adquirió varios bienes inmuebles en la Isla. Posteriormente, la pareja se mudó a Florida, donde adquirieron el inmueble objeto de la controversia. El matrimonio vivió algunos años en ese inmueble, que les sirvió como hogar familiar. (Sentencia recurrida, Apéndice del recurso, pág. 3.)

Vigente el matrimonio, el 29 de abril de 1997, mediante escritura pública ("*Warranty Deed*") y a tenor de las leyes de Florida, el señor Roselló le transfirió su participación en el inmueble a la señora Rodríguez a cambio de $10 "*and other valuable consideration*". ("*Warranty Deed*", Apéndice del recurso, exhibit 2.) Así, el inmueble "*pasó*" al patrimonio de la señora Rodríguez, según las leyes de ese estado. (Sentencia recurrida, Apéndice del recurso, pág. 3.)

El 7 de abril de 2003, el Tribunal de Primera Instancia, Sala Superior de Bayamón, declaró disuelto el matrimonio de las partes mediante sentencia de divorcio por la causal de separación. (Apéndice del recurso, exhibit 1.) La sociedad legal de gananciales no se liquidó de inmediato, por lo que se constituyó entre las partes una comunidad de bienes posdivorcio. (Sentencia recurrida, Apéndice del recurso, pág. 3.)

No obstante lo anterior, el señor Roselló continuó pagando el préstamo hipotecario del inmueble ubicado en Florida hasta agosto de 2003, fecha en que la señora Rodríguez lo vendió por $450,000 a un tercero. ■ (Recurso de *Certiorari*, pág. 3.) Según la señora Rodríguez, ella satisfizo el resto de la deuda hipotecaria con dinero privativo y reclamó un crédito por ese concepto. (Contestación a Demanda de Divorcio y Reconvención, Apéndice del recurso, pág. 23.) Antes del divorcio, las partes ya habían regresado a Puerto Rico y residieron en los inmuebles que adquirieron mientras estaban casados. (Recurso de *Certiorari*, pág. 4.

Como secuela del divorcio, el tribunal sentenciador expidió una orden a los fines de prohibir "*la venta de bienes, muebles o inmuebles, de naturaleza ganancial sin el consentimiento de las partes o disposición del tribunal*". (Apéndice del recurso, pág. 43.) Posteriormente, el 7 de diciembre de 2004, se celebró una vista de seguimiento para, entre otros asuntos, dilucidar la controversia surgida sobre el inmueble de Florida. (Sentencia recurrida, Apéndice del recurso, pág. 2.) El 13 de diciembre de 2004, el señor Roselló solicitó que la señora Rodríguez consignara los frutos de la venta del inmueble. ■ (Oposición a Petición de *Certiorari*, pág. 2.) El 4 de abril de 2005, el Tribunal de Primera Instancia, Sala Superior de Bayamón, dictó la sentencia sumaria parcial que dispuso de la cuestión planteada de modo favorable a la parte recurrida:

"*[Q]ue el bien inmueble sito en el estado de Florida originalmente adquirido por los cónyuges, aquí partes, durante su matrimonio y que el demandante le transfirió su derecho sobre el bien a su esposa mediante escritura de compraventa (Warranty Deed) quedando el título de la misma exclusivamente en su nombre (sic). Determinamos que el negocio es uno válido de acuerdo a las leyes de Florida y, de acuerdo con el estatuto real establecido en el Artículo 10 y el Artículo 11 del CCPR, las leyes aplicables a los bienes inmuebles y los contratos que los afectan son las del lugar donde está sita la propiedad inmueble. Por tanto, declaramos NO HA LUGAR las mociones de la parte demandante solicitando el dep[ó]sito de las ganancias de la compraventa de la Propiedad y desestimando [sic] toda alegación de la parte demandante sobre dicha Propiedad, ya que la misma es un bien privativo.*"

Insatisfecho con tal dictamen, el señor Roselló le imputa al foro primario el siguiente error:

"*Erró el Tribunal de Primera Instancia, Sala Superior de Bayamón, Honorable Juez Luis G. Quiñones Martínez, al resolver que la prohibición establecida por los Artículos 1286 y 1347 del Código Civil de Puerto Rico que prohíben la donación o compraventa entre los cónyuges durante el matrimonio regido por la*

*Sociedad Legal de Gananciales no son de aplicación cuando dicha Sociedad de Gananciales adquiere un bien inmueble fuera de la jurisdicción de Puerto Rico, en específico el Estado de Florida. El Tribunal erró al resolver que el Artículo 10 del Código Civil de Puerto Rico en cuanto dispone que los bienes inmuebles est[á]n sujetos a las leyes del país en que est[á]n sitos anula la vigencia de los Artículos 1286 y 1347, supra. Esta decisión es contraria al estado de derecho vigente en Puerto Rico que reconoce la unicidad del patrimonio matrimonial, sin distinción entre bienes muebles e inmuebles cuando se trata de conflictos entre los cónyuges exclusivamente (sin afectar terceras personas)."*

Alega el señor Roselló que la transferencia de su participación en el inmueble se hizo porque *"[l]a intención de las partes era "proteger" dicho bien ganancial de cualquier acreedor futuro producto del ejercicio de la actividad de venta de seguros del señor Roselló".* (Énfasis en el original. Moción Urgente y Solicitud de Consignación, Apéndice del recurso, pág. 33.) Mas *"nunca fue la intención de las partes hacer una donación o venta entre marido y mujer".* (Énfasis en el original. Recurso de *Certiorari*, pág. 4.)

La señora Rodríguez, por su parte, adujo ante el tribunal *a quo* que *"[d]icho traspaso, según fue efectuado y aún por los propósitos alegados por el demandante, es totalmente válido en el estado de Florida, lugar donde está sito el bien inmueble".* (Informe de Conferencia con Antelación al Juicio, Apéndice del recurso, pág. 63.) En la contestación a la demanda admitió el carácter ganancial del inmueble, pero alegó *"que el demandante le cedió su participación [en] dicha propiedad... quedando dicho bien como uno privativo de la demandada".* Además, admitió que incurrieron en una deuda hipotecaria sobre el inmueble que ambos asumieron como codeudores. (Contestación de la demanda, Apéndice, pág. 23.)

Ante nos, la recurrida presenta una extensa discusión sobre la legislación y jurisprudencia de Florida que permite la contratación entre cónyuges, incluida la donación, y la disposición de los bienes particulares de un cónyuge sin el consentimiento del otro. (Oposición a la Petición, págs. 12 y ss.)

## II

El señalamiento de error que alega el recurrente puede bifurcarse en los siguientes tres asuntos: (1) las normas de derecho imperativo que regulan el patrimonio ganancial de los domiciliados de Puerto Rico; y (2) la validez y la eficacia del acto jurídico realizado por el matrimonio puertorriqueño sobre el bien inmueble sito en el estado de Florida, pero perteneciente a la sociedad de gananciales de los contratantes; (3) el modo de reglar la irregularidad de la disposición simulada, luego de haberse enajenado el bien a un tercero.

### - A -

El Código Civil de Puerto Rico establece la sociedad legal de gananciales como el régimen económico matrimonial supletorio ante la ausencia o insuficiencia de capitulaciones matrimoniales. Código Civil de Puerto Rico, Art. 1267, 31 L.P.R.A. sec. 3551. El régimen económico de la sociedad legal de gananciales comienza desde el momento en que se celebra el matrimonio y finaliza cuando éste se disuelve, ya sea por muerte o divorcio. Arts. 1295-1326 y 1315, 31 L.P.R.A. secs. 3621-3701 y 3681, respectivamente.

El propósito del régimen ganancial es la consecución de los fines particulares del matrimonio y de la familia que éste constituya. Como no se le reconoce ánimo lucrativo alguno, de ordinario, *"se entiende que la gestión económica de cada cónyuge se hace para beneficio de la sociedad y no para beneficio individual".* *Pujol Betancourt v. Gordón Menéndez*, res. el 3 de noviembre de 2003, 160 D.P.R. __ (2003), **2003 J.T.S. 166**, a la pág. 344, que cita con aprobación a Raúl Serrano Geyls, *Derecho de familia de Puerto Rico y legislación comparada*, Vol. I, 338 (1997); a *Int'l. Charter Mortgage Corp. v. Registrador*, 110 D.P.R. 862, 866 (1981); y a *García v. Montero Saldaña*, 107 D.P.R. 319, 322 (1978).

Durante la vigencia del régimen de gananciales, ambos cónyuges *"son codueños y coadministradores de la totalidad del patrimonio matrimonial, sin distinción de cuotas".* *Montalván Ruiz v. Rodríguez Navarro*, res. el

23 de marzo de 2004, 161 D.P.R. ___ (2004), **2004 J.T.S. 48,** a la pág. 786, que cita con aprobación a Joaquín J. Rams Albesa, *La Sociedad de Gananciales* 28 (1992).

En virtud de lo anterior, los bienes que se adquieren a título oneroso con el caudal común son bienes gananciales y ambos cónyuges comparten su titularidad, independientemente de que se adquieran para uno sólo de ellos. También son bienes gananciales los que se adquieren mediante *"la industria, sueldo o trabajo de los cónyuges"* y *"los frutos percibidos o devengados durante el matrimonio"*. Código Civil de Puerto Rico, Art. 1301, 31 L.P.R.A. sec. 3641.

Sin embargo, cada cónyuge conserva la titularidad de los bienes particulares que trajo a la sociedad y aquéllos que adquiere mediante un título lucrativo o en sustitución de sus bienes particulares, por virtud del instituto de la subrogación real. Código Civil de Puerto Rico, Art. 1299, 31 L.P.R.A. sec. 3631; *García v. Montero Saldaña*, 107 D.P.R., a la pág. 335.

A menos que se demuestre lo contrario, todos los bienes del matrimonio se presumen bienes gananciales. Asimismo, todas las deudas y obligaciones del matrimonio se reputan gananciales. Art. 1308, 31 L.P.R.A. sec. 3661. No obstante, tal presunción es controvertible. *Espéndez v. Vda. de Espéndez*, 85 D.P.R. 437, 441-442 (1962). Lo anterior provoca que en las controversias generadas en torno a la naturaleza ganancial o privativa de los bienes conyugales, la parte que sostiene el carácter privativo tiene el peso de la prueba. *Echevarría Jiménez v. Scn. Pérez Meri*, 123 D.P.R. 664, 681 (1989). Sobre esta exigencia, el Tribunal Supremo ha señalado que *"el rigor de la prueba es menor cuando se trata de una reclamación entre los ex cónyuges o entre los herederos de uno y el cónyuge supérstite que cuando se litigan derechos frente a terceros"*. *Pujol Betancourt v. Gordón Menéndez*, **2003 J.T.S. 166**, a la pág. 345; *García v. Montero Saldaña*, 107 D.P.R., a la pág. 335.

Al disolverse el matrimonio y, por consiguiente, al finalizar la sociedad legal de gananciales, los cónyuges hacen suyos por mitad *"las ganancias o beneficios obtenidos indistintamente por cualquiera de [éstos] durante el mismo matrimonio"*. Art. 1295, 31 L.P.R.A. sec. 3621.

Sobre este extremo, el Tribunal Supremo ha señalado que la sociedad legal de gananciales *"parte del presupuesto de que aquella ganancia o beneficio es de ambos porque aun cuando un cónyuge haya tenido una intervención decisiva en la adquisición,... la contabilización como ganancia es obra del ahorro y sacrificio también del otro"*. *Pujol Betancourt v. Gordón Menéndez*, **2003 J.T.S. 166**, a la pág. 344, que cita con aprobación a Luis Diez-Picazo y Antonio Gullón, *Sistema de Derecho civil*, Vol. IV, 175 (7ma ed., Tecnos1997).

Una vez concluye la sociedad legal de gananciales, procede su liquidación, previa realización del inventario de los activos y pasivos acumulados. El inventario incluye, además de los bienes tangibles, los créditos que *"deban rebajarse del capital del marido o de la mujer"*, así como *"el importe de las donaciones o enajenaciones que deban considerarse ilegales o fraudulentas"*. Pagadas las deudas y hechas las deducciones de rigor que el Código ordena, se determina el caudal ganancial y se procede a la adjudicación de éste por mitad entre ambos cónyuges. Arts. 1317 a 1322, 31 L.P.R.A. secs. 3692 a 3697.

**- B -**

De otro lado, el Código Civil impone límites a los negocios o actos jurídicos que ambos cónyuges pueden celebrar entre ellos o ante terceros. En Puerto Rico se prohíbe toda contratación entre cónyuges sujetos al régimen de sociedad legal de gananciales, con excepción de los convenios permitidos en las capitulaciones matrimoniales, que deben suscribirse antes del matrimonio, y el contrato de mandato, que sirve bien para la administración y disposición de los bienes comunes o particulares por uno sólo de los consortes. Puerto Rico es una de muchas jurisdicciones que aún tienen esas limitaciones, aunque aumenta el número de ordenamientos que van liberalizando ese estado de cosas. Véase *Estudio sobre los Regímenes Económicos del Matrimonio*

*presentado a la Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico* 38 y ss. (San Juan 2001).

En lo que atañe al caso de autos, los cónyuges no pueden donarse bienes o haberes entre ellos, a menos que se trate de *"regalos módicos [...] en ocasiones de regocijo para la familia"*. Art. 1286, 31 L.P.R.A. sec. 3588. Tampoco pueden *"venderse bienes recíprocamente, sino cuando se hubiese pactado la separación de bienes, o cuando hubiera separación judicial de los mismos bienes"*. Art. 1347, 31 L.P.R.A. sec. 3772. Aunque no surge claro de la normativa, las donaciones menores permitidas deben salir del patrimonio particular del cónyuge y no de la masa ganancial, porque si no fuera así, el patrimonio ganancial recibido en donación sería ya patrimonio del cónyuge donatario. *Id.*, a la pág. 44.

Tampoco puede hacerse el desplazamiento gratuito entre cónyuges de modo indirecto, por medio de la donación a los hijos e hijas o causantes legítimos del donatario. La prohibición se da por razón de la relación personal que genera el matrimonio, no por el régimen económico que rige la relación conyugal, es decir, con independencia del régimen que adopten los cónyuges para regir la economía conyugal. *Id.*

Esta regla prohibitiva se ha asociado con el principio de la inmutabilidad del régimen económico matrimonial, ya que los cónyuges pueden afectar la composición o integridad de la masa comunal por medio de actos dispositivos entre ellos. La doctrina moderna esgrime otros fundamentos para sostener la prohibición de donar entre cónyuges, entre ellos, *"que la libertad para modificar a voluntad las convenciones matrimoniales o de celebrar contratos libremente proporcionaría todas las facilidades posibles para que se obtuvieran ventajas ocultas e irrevocables, nocivas al otro cónyuge, a la comunidad y a terceros. La debilidad del cónyuge propietario o cotitular del patrimonio en juego puede propiciar que el más fuerte saque ventaja del más débil y se haga de un patrimonio por medio de artimañas o abuso de la relación afectiva y fiduciaria que existe entre los cónyuges."* *Id.*, a la pág. 43.

La legislación puertorriqueña, ante esa posibilidad, pretende salvaguardar los intereses conyugales y *"evitar influencias, coacciones y abusos que el cónyuge más fuerte podría ejercer sobre el más débil"*, en palabras del profesor Raúl Serrano Geyls. No sólo protege a los cónyuges entre sí, sino también a terceros que hayan contratado con uno de los cónyuges o con ambos. La norma también procura evitar el fraude y los actos jurídicos que de cierta manera atentan contra el bienestar de los cónyuges y de la institución familiar. Serrano Geyls, *Op. Cit.*, Vol. I, 317.

Por otro lado, la cesión de la participación ganancial sobre los bienes gananciales por un cónyuge a favor del otro también está proscrita de nuestra legislación. Podría uno de los cónyuges renunciar a su participación luego de la disolución del matrimonio, pero nunca antes. Art. 1316, 31 L.P.R.A. sec. 3691.

Por lo dicho, la venta o donación entre cónyuges no son actos anulables; son actos nulos o inexistentes. Tal norma está sostenida en una política pública que procura mantener el patrimonio conyugal libre de la actuación impropia y abusiva de un cónyuge sobre otro, así como la certeza y continuidad de la composición de las tres masas patrimoniales que coexisten en la economía matrimonial.

- C -

Como parte del entramado propio del Derecho internacional privado, nuestro Código Civil establece unas reglas generales para dilucidar las controversias que involucran a los domiciliados de Puerto Rico con personas extranjeras y a los actos jurídicos celebrados en el extranjero o sobre bienes inmuebles sitos en el extranjero, sobre los que intervengan los ciudadanos de Puerto Rico. De esa manera, el Código Civil distingue entre las normas que rigen las relaciones personales, el estado y la capacidad legal de las personas, el tratamiento que reciben los bienes, sean muebles o inmuebles, así como las formas y solemnidades de los actos jurídicos celebrados en Puerto Rico o la validez y eficacia de los celebrados en otros países o estados.

A esos efectos, el Artículo 9, conocido como el estatuto personal, dispone que: *"Las leyes relativas a los derechos y deberes de familia, o al estado, condición y capacidad legal a las personas, obligan a los ciudadanos de Puerto Rico, aunque residan en países extranjeros."* (Énfasis nuestro.) 31 L.P.R.A. sec. 9. En Puerto Rico, el domicilio de un ciudadano determina la aplicación del estatuto personal. *Martínez v. Vda. de Martínez*, 88 D.P.R. 443 (1963); *León Rosario v. Torres*, 109 D.P.R. 808 (1980).

El Artículo 10, conocido como el estatuto real, por su parte provee: *"Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos."* (Énfasis nuestro.) 31 L.P.R.A. sec. 10. No olvidemos, sin embargo, que en *Toppel v. Toppel*, ya citado, se dijo que los asuntos relativos a la caracterización y liquidación de los bienes que componen el patrimonio ganancial, por su naturaleza, no han de regirse por este precepto. Incluso, el tribunal modificó con este dictamen las doctrinas sentadas en los casos de *Babilonia v. Registrador*, 62 D.P.R. 688 (1943); *Fenning v. Tribunal Superior*, 96 D.P.R. 615 (1968), y *Pueblo v. Denis*, 98 D.P.R. 704 (1970).

El Artículo 11, conocido como el estatuto formal o mixto, recoge la doctrina conocida como *locus regit actum* o *lex loci actus*, y establece lo siguiente:

*"Las formas y solemnidades de los contratos, testamentos y demás instrumentos públicos, se rigen por las leyes del país en que se otorguen.*

*Cuando los actos referidos sean autorizados por funcionarios o consulares de los Estados Unidos en el extranjero, se observarán en su otorgamiento las solemnidades establecidas por las leyes de los Estados Unidos.*

*No obstante lo dispuesto en este artículo y en el anterior, las leyes prohibitivas concernientes a las personas, sus actos o sus bienes, y las que tienen por objeto el orden público y las buenas costumbres, no quedarán sin efecto por leyes o sentencias dictadas, ni por disposiciones o convenciones acordadas en países extranjeros."*

(Énfasis suplido.) 31 L.P.R.A. sec. 11.

El párrafo final de este precepto contiene una norma de excepción a la norma general que establece que los bienes inmuebles se rigen por las leyes del país donde están sitos. La norma general no aplicará cuando tales leyes: (1) sean contrarias a las leyes puertorriqueñas que prohíben a las personas realizar ciertos actos entre ellos mismos, en sus relaciones con otras personas o respecto a sus bienes; y (2) sean contrarias al orden público y a las buenas costumbres de Puerto Rico.

Ante esos dos supuestos, siempre aplicará la norma de excepción, es decir, prevalecerá la legislación puertorriqueña sobre la extranjera. ■ En el primer supuesto, podemos ubicar la prohibición absoluta que impone nuestro derecho a la donación entre cónyuges. También podemos ubicar bajo este supuesto el principio de inmutabilidad del régimen matrimonial. El segundo supuesto relativo al orden público, sin embargo, es un tanto difuso, por lo que debemos estudiar los desarrollos doctrinales en Puerto Rico y España, fuente de procedencia del Derecho patrio, y de otras jurisdicciones de origen civilista para estimar su alcance.

En Puerto Rico, tenemos como ejemplo de la aplicación de la norma de excepción el caso de *Colón v. Registrador*, 67 D.P.R. 17 (1947). El Tribunal Supremo no aceptó la validez de un testamento mancomunado otorgado en el extranjero, por razón de ser esos testamentos contrarios al orden público. ■ Otros actos, sin embargo, no necesariamente revisten ese carácter. Cf. *Vda. de Ruiz v. Registrador*, 93 D.P.R. 914 (1967).

Como cuestión de umbral, conviene destacar la colaboración y la coordinación internacional sobre la

aplicación de la norma de excepción ante controversias que trastocan el orden público de los estados nacionales. Adviértase que no existe una definición absoluta de orden público, porque es prácticamente imposible delimitar en forma abstracta y teórica ese concepto, ante la infinidad de posibilidades que admite la idea. Véase, Adolfo Miaja de la Muela, *Derecho Internacional Privado*, T. I, 393-397 (7ma ed., Lope de Vega 1976).

En la doctrina puertorriqueña, el profesor Serrano Geyls expresa sobre el alcance de este concepto en el área del Derecho que nos ocupa:

*"[L]as normas jurídicas que rigen la familia son ordinariamente de orden público y, por tanto, imperativas e inderogables; se refieren a relaciones de dependencia y todavía, en ciertos casos, de superioridad; los derechos son a la vez deberes y son recíprocos, inalienables, intransmisibles, irrenunciables e imprescriptibles; el estado familiar no está sujeto a condición o término; no se aplica el principio de representación, excepto ocasionalmente (ej., el matrimonio por poder); prevalecen las formas solemnes y las intervenciones oficiales y existen reglas especiales de capacidad jurídica para realizar ciertos actos."*

Serrano Geyls, *Op. Cit.*, Vol. I, 317.

En el Derecho español, Miaja de la Muela expresa sobre ese particular:

*"[L]as leyes traducen concepciones morales y exigencias técnicas cuya vigencia se estima indispensable para el bien común de una sociedad estatal, por lo que las soluciones contrapuestas se consideran radicalmente antijurídicas, procedan de la voluntad de las partes o de la aplicación de las leyes extranjeras basadas en otras concepciones morales.*

*Es claro que en este último sentido, como barrera a la penetración de instituciones extranjeras, el orden público no puede funcionar más que en aquellas materias en que también limita dentro de las relaciones internas los efectos de la voluntad de los destinatarios de las normas."*

Miaja, *Op. Cit.*, pág. 389.

Miaja concluye que la inaplicabilidad del Derecho extranjero sólo debe producirse en casos extremos y *cuando ello sea absolutamente necesario, debe atenuarse sus efectos, preservando los derechos adquiridos siempre que sea posible.* Miaja, *Op. Cit.*, pág. 400.

Miaja también resume las distintas orientaciones jurídicas que descartan el desplazamiento de la ley del foro ante las leyes foráneas. Entre ellas, cita las ideas de Savigny, para quien la norma de excepción aplica ante *"leyes de naturaleza positiva rigurosamente obligatoria y las instituciones de un Estado extranjero cuya existencia no está reconocida en el foro"*. Miaja, *Op. Cit.*, pág. 383.

[E]l orden público, en todos los países, comprende también en la acepción más amplia de la palabra el respeto de los principios superiores de la moral humana y social tal como son entendidos y profesados en aquel país, las buenas costumbres, los derechos primitivos inherentes a la naturaleza humana y las libertades, a las cuales ni las instituciones positivas, ni ningún gobierno, ni los actos de la voluntad humana podrían aportar derogaciones válidas y obligatorias para estos Estados. Si las leyes positivas de un Estado, una sentencia extranjera, o los actos o contratos realizados en el extranjero violan estos principios o esos derechos, cada soberanía, lejos de aceptar estos ultrajes a la naturaleza y a la moralidad humana, puede, a justo título, recusarles todo efecto y toda ejecución en su territorio.

Miaja, *Op. Cit.*, págs. 383-384, que cita con aprobación a Manzini, *Rapport à l'Institut de Droit international*, Journal de Droit international 295 (1874).

Entre las posturas internacionales reseñadas por Miaja, se destacan por su pertinencia al tema de marras, las siguientes. Bustamante *"opone las leyes de orden público internacional, concebidas con la misma amplitud, a las que llama de orden público interno, caracterizadas por seguir universalmente a los nacionales o domiciliados en el país que las dictó"*. Bustamante, *El orden público*, Estudio de Derecho internacional privado (La Habana 1893), según citado por Miaja, *Op. Cit.*, pág. 384.

Diena, por su parte, distingue las leyes referentes a la propiedad y a los derechos reales de las de orden público. *"En éstas, la territorialidad conduce a la aplicación de la ley del foro; en aquéllas, a la de situación de los bienes, que puede ser distinta de la anterior, supuesto en el que el Tribunal ha de aplicar una ley extranjera para él, contra la cual puede hacer uso de la excepción de orden público"*. Miaja, *Op. Cit.*, pág. 385, que cita a Diena, *I diritti reali considerati nel Diritto inernazionale privato* (Turín 1895). Lienhard expresa que *"[e]l orden público significa siempre la intervención de un principio, escrito o no, de la legislación territorial, con el cual jamás se aplicará la legislación extranjera contraria a este principio territorial ni es susceptible de aplicarse"*. *Id.*

Mientras que Von Bar señala que *"[e]n cada caso hay que investigar si lo que debe ser rechazado es la ley extranjera o sus consecuencias solamente"*. Miaja, *Op. Cit.*, pág. 390, que cita a Von Bar, *Theorie und Praxis des internatinalen Privatrecht* 26-27 (Leipzig 1899). En esa misma vertiente, Pillet y Niboyet distinguen el conflicto de leyes de *"la eficacia extraterritorial de los derechos adquiridos en un país extranjero"*. Miaja, *Op. Cit.*, pág. 390. Lagarde, por su parte, apunta que un juez no puede descartar la aplicación de la ley extranjera a menos que el *"sistema de normas conflictuales atribuy[a] la solución de la cuestión principal del pleito al Derecho material del foro"*. Miaja, *Op. Cit.*, pág. 391.

Sobre este mismo tema, el clásico tratado de Manresa señala:

*"El permitir la licitud de los actos de los españoles en el extranjero contrarios a las leyes vigentes en España, cuando éstas sean aplicables, como lo son las relativas al matrimonio, además de privar de eficacia el art. 9° del Código civil, hace posible el fraude a la ley. Las cuestiones derivadas de la contracción o disolución del matrimonio son de orden público; y en el conflicto entre la norma extranjera y el orden público nacional, debe prevalecer siempre, sin excepción, el último (sentencia de 12 de mayo de 1944)."*

José María Manresa y Navarro, *Comentarios al Código Civil Español*, To. I, 249 (7ma ed., REUS 1956).

De la doctrina antes esbozada se puede colegir que las distintas posturas tienen tres puntos de aproximación. Primero, la norma de excepción aplica cuando la ley extranjera es totalmente extraña al ordenamiento jurídico del foro, particularmente cuando impacta las instituciones jurídicas fuertemente reguladas. Segundo, aunque aplique la norma de excepción, deben protegerse los derechos adquiridos por mediación de la ley foránea, siempre que ello sea posible sin infringir otros principios del foro de igual importancia. Esta regla se conoce como **la norma de efecto atenuado y se aplica especialmente cuando la solución puede afectar los derechos adquiridos por terceros.** Por último, los jueces debemos analizar la aplicación de la norma de excepción a la luz de las circunstancias particulares de cada caso.

**- D -**

El caso de autos no presenta un problema de conflicto móvil, generado por el traslado de las partes, mientras estaban casadas, al estado de Florida. No hay controversia sobre ese aspecto particular. Los litigantes están sujetos a las leyes de Puerto Rico y su régimen se rige por las normas que gobiernan el régimen de gananciales. Sin embargo, es importante destacar el dato de que la jurisprudencia que trata ese tema se encargó de definir las reglas conflictuales que regulan la fijación del régimen económico de un matrimonio entre personas que mudan su domicilio a un estado extranjero, pero también sirvió para establecer las reglas que han de aplicarse a la determinación y la liquidación del patrimonio conyugal que está disperso en varias

jurisdicciones, cuando ocurre la disolución del matrimonio. Así, en *Toppel v. Toppel*, 114 D.P.R. 775, 784 (1983), se dijo sobre este particular:

*"En lo que toca a las relaciones patrimoniales de los cónyuges, los países civilistas latinos no aplican generalmente el estatuto real, el cual retienen, de conformidad con sus orígenes y desarrollo, para otros fines. [Citas omitidas.] Existe también la tendencia a no distinguir entre bienes muebles e inmuebles para el propósito que nos ocupa y a escoger una sola ley, a veces de aplicación compleja, para regir las relaciones patrimoniales entre los cónyuges."* [Citas omitidas.]

Para regular las controversias de Derecho Internacional Privado o de conflicto de leyes en materia de régimen económico matrimonial, el Tribunal Supremo de Puerto Rico estableció algunas reglas en esa opinión, entre las que son de particular aplicación al caso de autos las siguientes:

*"1ª. Los efectos del matrimonio y el divorcio sobre el régimen de los bienes conyugales presentan problemas conflictuales propios, cuya solución no debe encomendarse a la doctrina estatutaria.*

*2ª. Aun dentro del campo reducido a que hace referencia la regla anterior, los principios que aquí se reseñan regirán tan sólo la relación inter vivos de los cónyuges entre sí. No se hace aquí expresión alguna sobre las reglas aplicables cuando el pleito es entre terceros acreedores y los cónyuges o cualquiera de ellos. Tampoco sobre problemas sucesorios.*

*3ª. La unicidad del patrimonio matrimonial, abrumadoramente favorecida por los países civilistas, constituirá también la regla puertorriqueña. [...]*

*4ª. Se adopta la doctrina del centro de los intereses matrimoniales, con los refinamientos que aporta el pensamiento norteamericano sobre los contactos dominantes en el caso de los bienes muebles y otros ajustes que se desprenden de lo que sigue.*

*5ª Toda regla conflictual —fenómeno frecuente en el derecho—, encierra el peligro de convertirse en pura norma mecánica. De ahí que su propósito cardinal no deba nunca perderse de vista. [...]*

*6ª Entre los intereses privados y públicos a examinarse, se cuentan: el domicilio o residencia habitual de los cónyuges, factor que merecerá especial consideración; [...]; la nacionalidad de las partes; las necesidades de los sistemas interestatal e internacional; las políticas pertinentes del foro; las políticas pertinentes de otros estados afectados y su interés en la decisión del asunto; la protección de las expectativas justificadas de las partes; las políticas básicas que animan el campo concernido; la predecibilidad y uniformidad del resultado en situaciones análogas; la protección de la parte más débil; y la aplicación, conforme a Leflar, de la regla más justa.*

*7ª [...]".* ■

*Toppel v. Toppel*, 114 D.P.R., a las págs. 790-793.

Estos pronunciamientos completan el marco normativo en que debemos enmarcar la controversia de autos, por tratarse de un conflicto entre dos cónyuges puertorriqueños, sobre un bien radicado en el extranjero y sobre una contratación hecha en el mismo lugar, la que contraviene una norma puertorriqueña de corte imperativo sobre la naturaleza y la disposición del patrimonio ganancial. Véase Serrano Geyls, *Op. Cit.*, Vol. I, págs. 493-512.

## III

En virtud de lo anterior, analicemos los hechos que tenemos ante nos y apliquemos los principios reseñados.

El inmueble en cuestión se adquirió durante el matrimonio del señor Roselló y la señora Rodríguez con dinero ganancial. No hay controversia sobre el hecho de que el inmueble pertenecía al patrimonio ganancial hasta el momento en que se produjo el desplazamiento de la masa ganancial al patrimonio de la señora Rodríguez. La cesión o transferencia simulada que realizó el señor Roselló a la señora Rodríguez no cambió la naturaleza ganancial del inmueble, porque en Puerto Rico, vigente el matrimonio, los cónyuges no pueden alterar la naturaleza del bien, aunque estuviera ubicado en otro país o estado, la sociedad no puede donar ni vender el bien a uno de los cónyuges, ni éstos disponer de su participación ganancial para favorecer a uno sólo de ellos. *Int'l Charter Mortgage v. Registrador*, 110 D.P.R. 862 (1981).

Si bien es cierto que la norma de conflicto relativa a los bienes inmuebles establece que la ley de Florida es la que regula la disposición del bien objeto de esta controversia, no es menos cierto que la ley de Florida que permitió la adquisición de un bien ganancial por uno de los cónyuges, aunque no es repugnante en sí misma, es contraria a la ley puertorriqueña que prohíbe a los cónyuges realizar contratos y donaciones entre sí. Es decir, las leyes de Florida responden a concepciones valorativas que trastocan substancialmente una norma de nuestro ordenamiento jurídico. ■ Aunque un acto sea válido en Florida, los efectos que produzca sobre las instituciones de Puerto Rico se rigen por las leyes y las políticas públicas de este foro.

La señora Rodríguez nos presenta una extensa y fundamentada exposición sobre la legislación de Florida que permitió el acto jurídico impugnado, particularmente la Sección 708.09 de los Estatutos de Florida ■ y la jurisprudencia que la interpreta. Hemos examinado con mucho interés y detenimiento las fuentes citadas y otras que nos parecieron aplicables al tema, pero ninguna contradice la norma excepcional del Artículo 11, ni excluye la aplicación de la norma de efecto atenuado sobre el resultado de la enajenación del bien ganancial, aunque se hiciera fuera de Puerto Rico y surtiera efectos jurídicos en el foro extranjero.

Procede declarar que el bien inmueble radicado en Florida era un bien ganancial, que los cónyuges estaban sujetos a las leyes de Puerto Rico en cuanto a su disposición, y que el valor atribuible al bien al momento de su enajenación a un tercero adquirente tiene que colacionarse como activo al hacerse el inventario de la sociedad de gananciales de las partes de este pleito.

Adviértase que estos ex cónyuges no están ajenos al Derecho patrio. No se trata aquí de dos personas extranjeras, sino de dos puertorriqueños que se han beneficiado de las leyes de este foro y están sujetos a él. El señor Roselló y la señora Rodríguez contrajeron matrimonio en Puerto Rico. Luego de casados, vivieron un tiempo en Puerto Rico y procrearon sus hijos aquí. Posteriormente, se trasladaron al estado de Florida y tras residir varios años allá, regresaron a Puerto Rico, donde mantuvieron su domicilio conyugal y aún mantienen su domicilio personal. Las partes también se divorciaron en Puerto Rico y poseen otros bienes inmuebles sitos en Puerto Rico, al amparo de nuestras leyes.

Lo anterior no representa una aplicación insularista del Derecho puertorriqueño. **La aplicación de la norma excepcional en su modalidad de efecto atenuado, nos permite reconocer la validez y la eficacia de la enajenación del inmueble a un tercero bajo las leyes de Florida, para propósitos de su titularidad actual.** La adquisición inicial y la enajenación posterior no repugnan al ordenamiento de Florida. ■ Sin embargo, ese reconocimiento no impide nuestra decisión final en el caso de autos, **limitada a los efectos que produjo el acto entre los ex cónyuges y sobre la liquidación de la sociedad y la adjudicación de los bienes gananciales luego del divorcio.** Igual resultado logramos con la aplicación del *Restatement (Second) of Conflict of Laws sec.* 234 (1971).

En este caso lo que verdaderamente ocurrió fue una subrogación real del inmueble por el precio o valor recibido. Ese precio, según las leyes de Puerto Rico, sustituyó al inmueble en el patrimonio ganancial. Aunque el traspaso a la señora Rodríguez y la venta subsiguiente del inmueble a un tercero fueran válidas según las leyes de Florida, **el bien nunca salió idealmente del patrimonio ganancial, porque no podía salir, por donación ni compraventa, para integrarse al patrimonio de uno sólo de los cónyuges**. En consecuencia, procede que el valor o precio recibido por la venta del inmueble se colacione como activo de la sociedad y se integre al caudal ganancial que ha de adjudicarse por mitad entre ambos ex-cónyuges. Esta es la misma sanción que reserva el Código Civil a otros actos que defraudan el caudal común. Véanse los artículos 1313 y 1317 del Código Civil, 31 L.P.R.A. secs. 3672 y 3692.

## IV

Por los fundamentos expresados, se revoca la sentencia parcial recurrida, se ordena al tribunal *a quo* que considere y colacione el precio de compraventa del inmueble en controversia como activo ganancial y, así considerado, que continúe los procedimientos de conformidad con los pronunciamientos hechos en esta sentencia.

Lo acordó y manda el Tribunal y lo certifica la Secretaria Interina del Tribunal de Apelaciones. El Juez Martínez Torres concurre con opinión escrita.

Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones

### ESCOLIOS 2006 DTA 120

**1.** El inmueble produjo una ganancia neta de $300,000. (Moción Urgente y Solicitud de Consignación, Apéndice del recurso, pág. 33.)

**2.** Luego, el 14 de enero de 2005, el señor Roselló modificó la cantidad a ser consignada. (Oposición a Petición de *Certiorari*, pág. 2.)

**3.** Miaja señala que la *"excepción a la aplicación de la ley extranjera declarada competente por la norma de conflicto, va a surgir con mayor claridad en el momento que estas normas aparecen incluidas dentro de los Códigos civiles..."*. En Derecho Internacional Privado, *Op. Cit.*, T. I, 382.

**4.** Véase también a *López v. González*, 151 D.P.R. 225 (2000) (Sentencia) en cuanto al aspecto de las formalidades solemnes de las capitulaciones matrimoniales.

**5.** Esta regla se refiere al conflicto móvil, que no está presente en el caso y que luego fue modificada parcialmente por la Ley Núm. 4 de 5 de marzo de 1987, que enmendó el Art. 1277 del Código Civil, 31 L.P.R.A. 3561.

**6.** A pesar de que nuestro Código Civil se encuentra bajo un proceso de revisión y reforma que bien pudiera propender a un cambio en el estado de Derecho vigente, no podemos adelantarnos a ese proceso y pretender usurpar la gestión que le corresponde a la Asamblea Legislativa oportunamente.

**7.** *"708.09. Married women's rights; agreements with husband, power of attorney, etc.*

*Every married woman may enter into agreements and contracts with her husband, may become the partner of her husband or others, may give a power of attorney to her husband, and may execute powers conferred upon her by her husband, including the power to execute and acknowledge all instruments, including relinquishments of dower, conveying, transferring, or encumbering property, or any interest in it, owned by her, or by herself and her husband as tenants by the entirety, or by her husband. All powers of attorney heretofore executed by a wife to her husband and vice versa, and the execution of all documents executed thereunder, are hereby validated and confirmed."*

## OPINIÓN CONCURRENTE DEL JUEZ MARTÍNEZ TORRES – 2006 DTA 120

San Juan, Puerto Rico, a 29 de septiembre de 2006

Entiendo que debe revocarse la adjudicación parcial que hizo el Tribunal de Primera Instancia, Sala de Bayamón (Hon. Luis G. Quiñones Martínez, Juez), porque ante las alegaciones del demandante-peticionario, Carlos Roselló Puig, surge la posibilidad de que la propiedad que las partes adquirieron en el estado de Florida fuera traspasada a la demandada-recurrida, Ruth N. Rodríguez Cruz, en fraude de acreedores. No se ha ilustrado al Tribunal de Primera Instancia acerca de las consecuencias de esa transacción bajo las leyes del estado de Florida. Discrepo totalmente, sin embargo, del razonamiento de la mayoría en la Sentencia, que en esencia, descarta dar entera fe y crédito a la ley de un estado hermano. Véase, 28 U.S.C. sec. 1738.

Los siguientes apuntes, aunque no pretenden ser exhaustivos, explican mi punto de vista jurídico:

*"La mayoría parte de la premisa de que nos encontramos ante un problema de derecho internacional privado que nos permite repudiar una ley de un estado de la Unión que no coincide con la nuestra. En verdad estamos ante un conflicto de leyes entre dos jurisdicciones de un mismo sistema federal. La diferencia va más allá de un problema de semántica."*

Las leyes de un estado de la Unión no son estatutos extranjeros, totalmente ajenos a nuestro ordenamiento jurídico. Por el contrario, en los Estados Unidos existen salvaguardas constitucionales, tales como las cláusulas de debido proceso de ley y de entera fe y crédito, que dan una medida de certeza de la justicia de las actuaciones oficiales dentro de cada estado de la Unión. *Restatement of Law, Second, Conflict of Laws*, American Law Institute, West, St. Paul, 1971, Vol. 1, Sec. 10, *Comment d.* Esas salvaguardas no nos son extrañas. Mucho menos lo son las leyes del estado de Florida, a donde se mudan a diario decenas de ciudadanos de Puerto Rico. Precisamente por eso es de esperarse que los conflictos de leyes como el que nos ocupa se susciten con más frecuencia en lo sucesivo. Ante esa realidad inevitable, es preciso tallar con precisión, sin exceder lo necesario, y siempre con la debida deferencia que el federalismo requiere *"para la cohesión interna entre las distintas jurisdicciones que interrelacionan en los Estados Unidos." Pueblo v. Martínez*, Opinión de 5 de mayo de 2006, 167 D.P.R. ___ (2006), **2006 J.T.S. 83,** a la pág. 1296.

En *Cruz v. Fernández*, 8 D.P.R. 580 (1905), y *Lokpez v. Fernández*, 61 D.P.R. 522 (1943), se estableció que la doctrina imperante para interpretar las disposiciones del Código Civil sobre conflictos de leyes en asuntos personales es la *lex fori* o domicilio. Posteriormente, en *Toppel v. Toppel*, 114 D.P.R. 775 (1983), se adoptan las doctrinas de la *"unicidad del patrimonio matrimonial"* y del *"centro de los intereses matrimoniales"*. Bajo esta última, el domicilio pasa a ser un *"factor que merecerá especial consideración"* para establecer la ley aplicable a la división de propiedad conyugal. *Ibíd*, a la pág. 791. Hasta ahí alcanza el precedente, aplicable a situaciones fácticas como la que enfrentó el Tribunal Supremo.

Sin embargo, la mayoría en el recurso que nos ocupa se ampara en *dicta* incluida en el caso de *Toppel, id.*, para negarle efectos en Puerto Rico a la ley de Florida y, por ende, al contrato entre cónyuges que se otorgó en ese estado. El Artículo 10 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 10, proviene del Código Civil de España. ■ Recoge la doctrina de la *lex situs* para establecer la ley que regirá los bienes inmuebles y la *lex fori* o domicilio para establecer el derecho que regirá en cuanto a los bienes muebles. *Shefftz v. Secretario de Hacienda*, 93 D.P.R. 888 (1967); *López v. Sotelo*, 70 D.P.R. 501 (1949). Cuando se aprobó el Código Civil de 1902, y luego el de 1930, se mantuvo esta disposición proveniente de España porque coincide con la doctrina prevaleciente en todas las jurisdicciones de Estados Unidos. Así lo admitió el Tribunal Supremo de Puerto Rico

en *Toppel v. Toppel, supra,* a la pág. 787. Sin embargo, el Tribunal añadió que el Artículo 10, *supra,* no se diseñó para resolver conflictos de leyes en la zona del régimen de los bienes patrimoniales porque en España no existía el divorcio, y que, por lo tanto, estamos ante una laguna en la ley. *Id.,* a la pág. 782.

Con todo respeto, ese pronunciamiento no sólo era innecesario para resolver el caso, sino que también es contrario al historial del Código Civil de Puerto Rico. Después de todo, es éste y no el de España el que tenemos que interpretar. Ya en *Bracons v. Registrador,* 24 D.P.R. 753 (1917), se señaló como la reforma legislativa más importante al Código Civil la relativa al alcance del Artículo 10, *supra,* al incorporarse el principio general del derecho estadounidense de que los derechos sobre los bienes inmuebles se regularán totalmente, en cuanto a la contratación e incluso en cuanto a los derechos hereditarios, por la ley del lugar en que los inmuebles están sitos. Como vemos, el precedente aún vigente nos indica que la laguna que el Tribunal Supremo identificó en *Toppel, supra,* no existe. El legislador reguló todo lo referente al conflicto de leyes en cuanto al patrimonio de los bienes muebles e inmuebles en el mismo código en el que reglamentó el divorcio. El texto español, entonces, debe interpretarse a la luz de esa nueva realidad puertorriqueña. Eso, a diferencia del calco de las interpretaciones de otras jurisdicciones, incluyendo España y otros países civilistas, es construir un derecho verdaderamente puertorriqueño.

Los pronunciamientos en *Toppel, supra,* no eran necesarios para resolver el recurso. Allí se trataba de determinar el patrimonio en una división de bienes sitos en Puerto Rico de un matrimonio domiciliado en la Isla. El centro de intereses estaba en Puerto Rico. No aplicaba el estatuto real (Art. 10 del Código Civil, *supra.*). Como son *dictum,* los pronunciamientos en Toppel no nos obligan.

Más aún, en 1987, la Asamblea Legislativa incorporó al Código Civil la doctrina de *Toppel, supra,* sobre el centro de intereses conyugales para determinar el régimen patrimonial que regirá el matrimonio contraído en otra jurisdicción entre una persona puertorriqueña y otra nacida fuera de la Isla, pero *"sin perjuicio de lo establecido en este título respecto a los bienes inmuebles."* Art. 1277 del Código Civil, según enmendado, *supra* sec. 3561. En otras palabras, el legislador rechazó la regla de la unicidad patrimonial en estas situaciones. Raúl Serrano Geyls, *Derecho de Familia de Puerto Rico y Legislación Comparada,* Univ. Interamericana, San Juan, 1997, Vol. I, pág. 510.

Consciente de lo anterior y de las limitaciones que el sistema federal impone, el reputado tratadista y ex Juez Asociado del Tribunal Supremo de Puerto Rico, Raúl Serrano Geyls, en su obra *Derecho de Familia de Puerto Rico y Legislación Comparada, ibíd,* concluye *"que Toppel continúa vigente, pero única y exclusivamente en situaciones idénticas a las que se dieron en el mismo."* (matrimonio contraído fuera de Puerto Rico y ninguno de los cónyuges es puertorriqueño, pero su centro de intereses es Puerto Rico, donde se encuentran todos sus bienes y el domicilio conyugal)

Los tribunales estamos obligados a aplicar las leyes. Esa es la esencia de nuestra democracia representativa. Afortunadamente aquí, a diferencia de las jurisdicciones civilistas puras, los pronunciamientos del legislador y los precedentes (no la *dicta*) del Tribunal Supremo pesan mucho más que las opiniones de los tratadistas y la academia. Esa es una aportación del híbrido derecho puertorriqueño al derecho civil.

No podemos ignorar y dejar de aplicar el Artículo 10 del Código Civil, *supra,* a este caso porque exista otra tendencia en otros países o porque la doctrina haya evolucionado y se hayan estructurado nuevas teorías. Véase, *Toppel, supra,* págs. 784-789. Aunque este Tribunal sostenga que no está haciendo tal cosa, la realidad es que está legislando contra la ley establecida. La tarea de enmendar o derogar el Artículo 10 del Código Civil, *supra,* le corresponde al legislador y no a la Rama Judicial en nuestro sistema.

De nuevo, es claro que el Artículo 10 controla esta situación. Consciente de que el Código Civil no tiene alcance extraterritorial, la mayoría recurre de manera muy fundamentada a darle un efecto atenuado al contrato

entre las partes. El problema es que bajo el Artículo 10 tenemos que darle plena efectividad a la ley del sitio (Florida) que convalida el contrato entre cónyuges respecto a inmuebles. No podemos darle **alguna** fe y crédito a dicha ley de Florida; tenemos que darle completo reconocimiento y validez, es decir, **entera** fe y crédito.

En nuestro sistema federalista, es un contrasentido afirmar que una ley de un estado de la Unión va contra el orden público meramente porque es distinta a la nuestra. No estamos ante una sentencia o ley de un país extranjero, sino ante un estatuto de un estado hermano al que estamos obligados a darle entera fe y crédito. Por tratarse de la aplicación de la ley a un bien inmueble en ese estado, estamos obligados a reconocer todos los efectos (a darle entera fe y crédito) que conlleva la ley de ese estado sobre el inmueble. ■

En ese sentido, el Artículo 10, *supra*, recoge en su interpretación, por voluntad legislativa, las normas de conflicto de leyes que son harto conocidas entre las jurisdicciones estadounidenses. Al respecto, el *Restatement of Law, Second, Conflict of Laws,* del *American Law Institute*, West, St. Paul, 1971, establece en su Volumen 2, Sección 234, que el efecto del matrimonio sobre los intereses de los cónyuges en terrenos que adquieren luego del matrimonio se determina por el derecho que apliquen los tribunales del lugar *(situs)* donde ubica el inmueble. Usualmente, ese derecho aplicable es el derecho del lugar donde ubica el inmueble. ■

De nuevo, al igual que el Artículo 10 del Código Civil, *supra*, se nos refiere a la ley del lugar en que está sito el inmueble. Bajo la ley de Florida, el esposo podía venderle el inmueble a su esposa. *Florida Statutes Sec.* 708.09. Al hacerlo, la propiedad deja de ser parte del caudal de la sociedad legal de gananciales y si el traspaso de título es válido, no hay suma alguna que colacionar al caudal al momento de disolver la sociedad y dividir los bienes. Por ejemplo, en *Bricks Unlimited, Inc. v. Agee*, 672 F.2d 1255 (5th Cir. 1982), un matrimonio domiciliado en Louisiana vendió un inmueble ubicado en Mississippi. En Louisiana rige el sistema de propiedad en comunidad *(community property)* y en Mississippi no. Surgió una controversia respecto a si los frutos o fondos provenientes de la compraventa del inmueble en Mississippi aprovechaban a la esposa, y se resolvió que los derechos patrimoniales de los cónyuges sobre la propiedad inmueble se determinan a base de la ley del estado donde está ubicada dicha propiedad. Por consiguiente, en este caso se resolvió a base de la ley de Mississippi y se determinó que los fondos adquiridos por la venta del inmueble no eran propiedad de la comunidad matrimonial *(community property)*.

No veo razón para crear en Puerto Rico normas distintas y extrañas de conflicto de leyes que no son consistentes con nuestro Código Civil y con el sistema federal en que vivimos, que a su vez hacen más difícil resolver controversias como la que nos ocupa, precisamente cuando la movilidad social de los puertorriqueños y la adquisición de inmuebles en los Estados Unidos es cada vez más común.

Coincido con la mayoría en que su decisión no es insularista. Más bien es expansionista. El error lógico de la mayoría es considerar que el contrato entre cónyuges es contrario al orden público local porque en Puerto Rico ese mismo contrato no sería válido si se otorgara aquí. Esa posición se estrella precisamente contra el ordenamiento local, que contempla que prevalece la ley del sitio donde está el inmueble, aunque sea distinta a la ley puertorriqueña. Por lo tanto, el contrato que se hace de conformidad con las leyes del sitio donde ubica el inmueble es por mandato del Artículo 10, *supra*, consistente con nuestro orden público y nuestras leyes. En otras palabras, la mera diferencia en la ley y sus efectos sobre la propiedad de los cónyuges no la hace contraria al orden público de Puerto Rico. ■

La gran pregunta, entonces, es si la ley de Florida permite o no este tipo de contrato. El Tribunal de Primera Instancia concluyó que sí, por la vía sumaria, es decir sin vista evidenciaria. El problema es que los mismos estatutos y jurisprudencia de Florida que citó el Tribunal de Primera Instancia en su sentencia hacen claro que el contrato que nos ocupa podría ser inválido si se hizo en fraude de acreedores *(conveyance in fraud of creditors)*. Las normas reconocidas de conflicto de leyes señalan que ese asunto se dilucidará también utilizando las leyes del lugar donde se ubica el inmueble fraudulentamente negociado. *Restatement 2d*, *supra*, Vol. 2, Sec. 223,

*Comment* f, págs. 13-14. ■

En este caso, el peticionario Roselló Puig abre la posibilidad a la existencia de un fraude de acreedores cuando alega que la intención de las partes al contratar fue que los acreedores de él no pudieran embargarle la vivienda. Ap., pág. 33. La recurrida Rodríguez Cruz no negó eso categóricamente, sino que se limitó a insistir en la validez de la transacción *"aun por los propósitos alegados por el demandante[-peticionario]..."*. Ap., pág. 63.

Esto hace que este asunto no se pueda dilucidar por la vía sumaria. Falta prueba sobre hechos pertinentes relativos a la intención de las partes. *Ramírez v. Soto*, Opinión de 14 de junio de 2006, 168 D.P.R. ___ (2006), **2006 J.T.S. 109**. Hay que pasar prueba sobre la intención de las partes para dilucidar si hubo o no un fraude de acreedores, según la ley de Florida.

Si se prueba ese fraude, entonces procede decretar la nulidad de la compraventa, según el derecho de Florida, y procede colacionar al caudal ganancial el valor del inmueble. Esto no afectaría las transacciones posteriores realizadas sobre el inmueble en Florida, al aplicarse los principios de tercería que el *common law* y el estado de Florida reconocen.

Esa colación, sin embargo, no puede ordenarse sin antes probarse el fraude de la compraventa. No procede en esta etapa como quiere este Tribunal en su muy fundamentada, pero equivocada Sentencia. Discrepo respetuosamente. Coincido en revocar la adjudicación sumaria del Tribunal de Primera Instancia, y devolvería el caso para que se dilucide luego de una vista probatoria si hubo fraude de acreedores, al aplicar el derecho del estado de Florida. No coincido con la colación a destiempo que ordena la mayoría.

Rafael L. Martínez Torres,
Juez de Apelaciones

**ESCOLIOS OPINIÓN CONCURRENTE DEL
JUEZ MARTÍNEZ TORRES - 2006 DTA 120**

**1.** *"§ 10. Bienes muebles e inmuebles*

*Los bienes muebles están sujetos a la ley de la nación del propietario; los bienes inmuebles, a las leyes del país en que están sitos."*

**2.** *"Comment:*

*b. Effect of the Constitution, Treaties and Laws of the United States. Certain provisions of the United States Constitution limit the power of the States of the United states in the field of Conflict of Laws and hence are themselves part of each State's Conflict of Laws rules (see § 3, Comment c). These provisions include:*

*The Full Faith and Credit Clause. This clause (Article IV, Section 1), in conjunction with its implementing statute (28 U.S.C. § 1738), sets forth the measure of respect which each State must give to the acts, records and judicial proceedings of a sister State.*

*The Due Process Clauses. The due process clause of the Fourteenth Amendment imposes limits beyond which a State of the United States may not extend the jurisdiction of its courts or the range of application of its law.*

*Analogous limitations upon the judicial and legislative jurisdiction of the Unites States are imposed by the due process clause of the Fifth Amendment."*

*Restatement of Law, Second, Conflict of Laws*, Vol. 1, Sec. 2, *Comment* b.

Esta admonición aplica por igual al Estado Libre Asociado de Puerto Rico, pues éste tiene las mismas facultades de gobierno interno que un estado de la Unión. Véase, *Examining Board v. Flores de Otero*, 426 U.S. 572 (1976).

**3.** *"§ 234. Effect of Marriage on an Interest in Land Later Acquired*

*(1) The effect of marriage upon an interest in land acquired by either of the spouses during coverture is determined by the law that would be applied by the courts of the situs.*

*(2) These courts would usually apply their own local law in determining such questions."*

**4.** *E.g., Restatement of Law, Second, Conflict of Laws*, Vol. 1, Sec. 90, *Comment* b: *"A mere difference between the local law rules of the two states will not render the enforcement of a claim created in one state contrary to the public policy of the other."*

**5.** *"f. Other questions of validity. Frequent questions, involving aspects of validity other than capacity and formalities, relate to illegality, the rule against perpetuities, fraud as between parties to the conveyance and fraud as against third persons, such as in the case of a conveyance in fraud of creditors. Usually, the courts of the situs would apply their own local law to determine such questions."*